818 So.2d 1221 (2002)
Retisha Jozette HILL, Appellant,
v.
Paul Steven MITCHELL, Omri Mitchell and Margaret Mitchell, Appellees.
No. 2001-CA-00682-COA.
Court of Appeals of Mississippi.
May 28, 2002.
*1222 Rex F. Sanderson, Houston, attorney for appellant.
Tommy Dexter Cadle, Booneville, attorney for appellees.
Before SOUTHWICK, P.J., THOMAS, and IRVING, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. In 1988, the paternal grandparents of an infant were granted temporary custody by chancery court decree. Though a few pleadings were then filed, no other relief was pursued until eleven years later when the child's mother sought to regain custody. Custody was denied, but the mother was granted regular visitation. The mother appeals, arguing that she was entitled to custody as against the grandparents. We find no error and affirm.

FACTS
¶ 2. Paul Steven Mitchell and Retisha Jozette Hill were married in 1986. The couple's only child, Khristal, was born in February 1987. The parents were divorced that December. They agreed to share legal and physical custody. The divorce decree did not contain any provision for visitation or for either parent to provide child support to the other.
¶ 3. In August 1988, Paul and his parents, Omri and Margaret Mitchell, filed a motion for a temporary emergency order. The motion alleged that since the final decree of divorce Khristal had resided with these paternal grandparents. The Mitchells alleged that the child's mother had taken the girl from their home while under the influence of alcohol and perhaps an illegal substance. The Mitchells also alleged that Hill "threatened to run with the minor child," and that she was unstable and unable to care for Khristal.
¶ 4. That same day, a chancellor entered an emergency order finding the child to be in immediate danger. The Mitchells were granted temporary physical custody pending a final hearing. The mother was given visitation rights but was ordered not to remove the girl from the Mitchells' home.
¶ 5. In September 1988, the Mitchells filed a complaint seeking permanent legal and physical custody of their granddaughter and a restriction on Hill's rights to visitation only. Attached to the complaint was an affidavit from the child's father that he joined in his parents' complaint. Paul Mitchell's affidavit stated that in his "opinion that it is for the best interest of my child ... that she be placed under the exclusive care, custody, and control" of his parents. Hill answered and filed a cross-complaint seeking sole physical custody of Khristal. The Mitchells answered the cross-complaint and began discovery. What if anything then occurred in unknown. Three deposition notices were filed, the last one being filed in January 1989. Whether any depositions were taken cannot be determined.
¶ 6. There were no further proceedings until the child's mother filed a complaint for modification in December 1999. Hill alleged that for the past eleven years that her daughter "has not had adequate [or] reasonable contact" with her and that it *1223 would be in Khristal's best interest to reside with her. She requested sole physical custody or "specified and normal regular visitation with her daughter." In February 2000, an agreed order was entered granting Hill temporary visitation during these proceedings. In April, another agreed order was entered continuing the temporary visitation arrangement. The order also allowed Khristal to be evaluated by a mental health professional for the purpose of providing guidance to the girl's mother and to the Mitchells as to how they were to interact with one another and Khristal. There is considerable evidence of tension and ill will between the child's mother and paternal grandparents.
¶ 7. A hearing was held over three days in July and September 2000; the chancellor rendered a decision on March 26, 2001. The Mitchells were found to be providing Khristal with a "stable" and "proper environment." Hill's home "would not have been a proper home for raising a minor child ..." as Hill "admitted to a lifestyle that did not correspond with her testimony of [her] efforts to be a mother" to Khristal. Significantly, the chancellor found that Hill had "constructively abandoned" Khristal and had "delegated parenting to the Mitchells."
¶ 8. The chancellor found that Hill failed to demonstrate a material change in circumstances and also failed to demonstrate that it would be in Khristal's best interest to be removed from the Mitchells. The chancellor granted Hill regular visitation and access to Khristal's school records.
¶ 9. Hill's appeal was deflected here. Miss.Code Ann. § 9-4-3 (Supp.2001).

DISCUSSION

1. Legal standard for custody modification
¶ 10. Hill argues that she should not have been required to demonstrate a material change in circumstances since the entry of the temporary custody order. As the child's parent, Hill alleges that she is entitled to the presumption that Khristal's best interest would be served by placement in her custody over any third party. Sellers v. Sellers, 638 So.2d 481, 484 (Miss. 1994). Hill argues that burden was on the Mitchells to overcome this presumption by proving abandonment, or that her conduct was so immoral as to be detrimental to the child, or that she was otherwise unfit to have custody. Sellers, 638 So.2d at 484.
¶ 11. The findings of the chancellor were that Hill had "constructively abandoned" the child, that giving her custody would not be in the daughter's best interest, and that there was no material change of circumstances since the 1988 custody decree.
¶ 12. In an older but quite similar case, custody had for a dozen years been almost exclusively with the mother's sister. The child's mother then sought to gain custody from her sister. Governale v. Haley, 228 Miss. 271, 275-77, 87 So.2d 686, 687-88 (1956). Shortly after the child had been born in December 1943, she and her mother moved in with the mother's sister and her husband. The sister cared for the child. Governale, 228 Miss. at 275, 87 So.2d at 687. The child lived at the sister's home from the age of one until the age of twelve with the exception of a one-year period from July 1953 until July 1954 when the girl lived with her mother. Id. at 275-77, at 687-88.
¶ 13. In 1951, the mother filed a petition to obtain custody, but no hearing was ever held. Id. at 276, at 688. There was, however, an order entered stating the mother and sister agreed that the child would remain with the sister but the mother would retain the right of visitation. Id. At one point, the mother allowed two years to pass without seeing her child. The mother also contributed little financially *1224 towards the care of the child. The child testified at trial that she did not consider the place where her natural mother lived to be her "home." Id. at 277, 87 So.2d at 688. The parents were divorced in 1945, and there is no mention of the father being involved in the custody dispute.
¶ 14. The Governale chancellor denied the mother's custody petition, which was then affirmed on appeal. The "natural right of the parents to custody will prevail" over the rights of those having had custody of a child for an extended period of time, assuming the parents are fit and have not abandoned the child. Governale, 228 Miss. at 278-79, 87 So.2d at 689. The Supreme Court stated that a parent could relinquish the custody of a child to another by "agreement or otherwise." Id. Abandonment would be found in certain limited circumstances:
[The parent has been] contributing nothing to its support, taking no interest in it, and permitting it to remain continuously in the custody of others, substituting such others in his own place so that they stand in loco parentis to the child, and continuing this condition of affairs for so long a time that the affections of the child and of the foster parents have become mutually engaged to the extent that a severance of this relationship would surely result in destroying the best interest of the child.
Id. at 281, 87 So.2d at 690.
¶ 15. The Court held that "if the circumstances are such that the restoration of the child to the custody of the parent would probably result in serious detriment to the welfare of the child, the court may properly refuse to order the child to be restored to the custody and control of the parent." Id. at 282, 87 So.2d at 690-91.
¶ 16. The legal definition of abandonment has remained consistent over time. In a 1983 decision, the Supreme Court defined "abandonment" as follows:
where a parent, without just cause or excuse, forsakes or deserts his infant child for such a length of time, and under such circumstances, as to show an intent to shirk or evade the duty, trouble or expense of rearing it, or a callous indifference to its wants, or a reckless disregard for its welfare, he or she is guilty of such abandonment.... Having once deserted the child, there is no guaranty that such a parent might not in the future be guilty of some equally atrocious conduct toward it.
Smith v. Watson, 425 So.2d 1030, 1035 (Miss.1983).
¶ 17. More recently, it was said that abandonment is "any course of conduct on the part of a parent evincing a settled purpose to forgo all duties and relinquish all parental claims to the child." Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992). Abandonment "may result from a single decision" or "may arise from a course of circumstances." Ethredge, 605 So.2d at 764. A court should objectively determine "whether under the totality of the circumstances, be they single or multiple, the natural parent has manifested his severance of all ties with the child." Id. Finally, "[a]bandonment must be proven by clear and convincing evidence." Id.
¶ 18. Another similar and more recent case found that a parent was not entitled to the presumption that the child's best interest would be served by having custody as against a third-party, specifically grandparents. Grant v. Martin, 757 So.2d 264, 266 (Miss.2000). There, the natural parents voluntarily gave full custody of their three children, ages four, two-and-a-half, and one-and-a-half to the father's parents. Grant, 757 So.2d at 264. Two years later, the children's parents were divorced. Id. at 265. In the final decree, the natural parents agreed that the paternal grandparents would retain full custody of the *1225 children. Id. The natural parents retained visitation rights. Id.
¶ 19. Nearly four years after relinquishing custody, the natural mother then sought to regain custody from the paternal grandparents. Id. At a hearing, the mother admitted that she provided the grandparents with almost no financial support, knew little or nothing about the children's education or health. Grant, 757 So.2d at 265. The mother was an "uninvolved parent," in the Court's view, despite the fact that she did have the children for weekend visitation every other week. Id. The chancellor allowed custody to remain with the paternal grandparents despite failing to find the mother had abandoned the three children or was unfit. Id. at 265-66.
¶ 20. On appeal, the Supreme Court held "that a natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption." Id. at 266. Where a natural parent voluntarily gives up custody, the parent would be required to show "by clear and convincing evidence that the change in custody would serve the best interests of the child." Id.
¶ 21. We apply these considerations to the facts of our case.

a. Relinquishment of Custody
¶ 22. Both Grant and Governale involve the voluntary relinquishment of custody. In Grant there was a final judgment of divorce and in Governale an apparent agreement with a family member, followed six years later by an agreed order regarding custody. In the present case, there is voluntary relinquishing of custody by only the father, Paul, by his affidavit attached to his parents' complaint for modification. The mother made no explicit relinquishment of custody. However, the Governale court stated that custody could be relinquished by "agreement or otherwise." We find that similar results arise from the voluntary and extended failure even to seek custody.
¶ 23. Hill acknowledged that the Mitchells had custody of Khristal prior to the December 1987 divorce. At that time, Khristal was eight months old. Hill agrees with the Mitchells that Hill did not see Khristal from at least the time that she was eight months old until three years of age. The temporary order was entered in August 1988 and the complaints were filed in September 1988. Khristal would have been eighteen months old when the temporary order was entered. Hill made no formal objection to the custody arrangement until she filed her cross-complaint for modification one month later. It is also apparent from Hill's own testimony that she did not see her child, for whatever reason, for the next year-and-a-half.
¶ 24. Hill laments that she never had a hearing after the 1988 emergency order. We do not know what happened, but the courts were open for any challenge that was to be pursued. A temporary order as to custody should not be allowed to remain in effect for such an extended period of time without a hearing. As one learned commentator noted, "the temporary order for custody will be effective only until the next term of court, but in a practical sense the temporary order will be allowed to stand until the case is determined on the merits if there is no undue delay." N. SHELTON HAND JR., MISSISSIPPI DIVORCE, ALIMONY AND CHILD CUSTODY §§ 22-1, 526 (1998).
¶ 25. We recognize the undue delay, but of all the people who potentially were responsible for that, it is clear the one concerned person did not share in that responsibility. That was the child, Khristal. Khristal's best interest remains paramount even as the adults delay.
*1226 ¶ 26. The substantial passage of time, both before the entry of the temporary order and certainly between 1988 and 1999, was an acceptance by Hill of the present custody arrangement.

b. Abandonment
¶ 27. The chancellor found that Hill's course of conduct over the past eleven years amounted to constructive abandonment. Hill's conduct matches the definition of "abandonment" as used by the Supreme Court in Governale and what was described as an "uninvolved parent" in Grant.
¶ 28. Hill stated that she visited with Khristal at least once a week for the past eleven years with each visit lasting one to two hours. The grandfather Omri Mitchell contended that Hill visited much less frequently, perhaps three to four times per year. Although Hill alleged that the longest period of time in which she did not visit Khristal was three or four months, she stated at one point that she did not see the child from the time of the divorce when she was eight months old and did not resume her visits until Khristal was three or four years old. Hill admitted that over the past ten years, she had visited Khristal on only three or four Saturdays, even though she did not work on that day. Hill also testified that the Mitchells would let her come over to visit Khristal any time that she liked.
¶ 29. The precise level of interest exhibited by Hill was contested. Yet, there was uncontested evidence that for eleven years Hill did not seek to modify the full-time custody of the grandparents. The mother's involvement with her child fluctuated, with perhaps two years passing when Khristal was an infant without any contact at all. What was a constant in Khristal's life was the care and custody of the grandparents. These facts are similar to those in Governale in which the mother was found to have abandoned the child although the child actually lived with the mother for at least a one year.
¶ 30. We find the chancellor's phrase "constructive abandonment" to be apt. This is not "abandonment" in the traditional sense, of complete avoidance of contact for an extended period of time. But it is voluntary abandonment of parental responsibilities for over a decade in the child's life. This kind of abandonment may need to continue for a longer period of time before it becomes legally significant. Yet at some stage, even occasional visits by parent cannot prevent a finding that the parent has so removed herself from active participation in a child's life such that abandonment has occurred.
¶ 31. We find that constructive abandonment occurred and that it has the same consequences as more traditional abandonment.

c. Best Interest of Child
¶ 32. The Supreme Court has stated that even if abandonment has occurred, a natural parent may be able to regain custody. Although the chancellor stated that no material change in circumstances had been shown, he also stated that a change in custody would not be in Khristal's best interest. What was in Khristal's best interest was the chancellor's primary concern. This is the standard used in both Governale and Grant. As noted previously, Grant requires that the natural parent, having voluntarily relinquished custody, demonstrate by clear and convincing evidence that the return of the child to the custody of that parent would be in the child's best interest. Grant, 757 So.2d at 266.
¶ 33. The chancellor stated that "Ms. Hill is now attempting to re-establish herself as a fit parent...." The chancellor found that the mother had admitted to a *1227 lifestyle which would have been incompatible with providing a proper home for Khristal. Hill admitted to one DUI arrest, a failed marriage and several failed relationships, and to several instances where she smoked marijuana.
¶ 34. The chancellor found that the Mitchells provided Khristal with a stable home and proper environment. Several friends and members of the Mitchells testified as to the relationship between the Mitchells and Khristal. Dr. Masur testified that he believed that the Mitchells "had a great deal of care and concern and love for the grandchild." Dr. Masur also stated that Khristal "seemed to enjoy the grandparents and be very comfortable with them."
¶ 35. The chancellor noted that Hill was making an effort to become a fit parent and appeared to have the support of her new husband, whom Khristal seemed to like, in her effort. "The right of the mother to the custody of her child, which was paramount in the beginning, has been compromised by her long acquiescence in a separation that was brought about by her own voluntary surrender of the custody...." Governale v. Haley, 228 Miss. 271, 283, 87 So.2d 686, 691 (1956). Once that has occurred, what is "of chief importance at this time are the best interests and welfare of the childthe right of the child not to be disturbed by a forced separation...." Id.
¶ 36. Not discussed in the chancellor's decision or on appeal are the child's wishes. At the time of the hearing, Khristal was thirteen years old. The chancellor erroneously stated that she was eleven. In Mississippi, the preference of a child aged twelve or older is to be given consideration in matters of custody. Miss.Code Ann. § 93-11-65(1)(a) (Supp.2001). A choice by the child usually is relevant only when the parents are contending over custody. Westbrook v. Oglesbee, 606 So.2d 1142, 1146 (Miss.1992). There are some different indications in Governale, but we find the more recent pronouncements to be controlling. Governale, 228 Miss. at 283-84, 87 So.2d at 691.
¶ 37. There was no manifest error when the chancellor found that Khristal's best interest was to remain with the grandparents.

2. Constitutional Issues
¶ 38. Hill claims that her right to due process was violated because the temporary order was allowed to remain in effect for such an extended period of time. She claims that she is now being "held accountable for failure of the father, the grandparents, and the court" to address the issue of custody over the past eleven years.
¶ 39. Among Hill's allegations is that during this eleven-year period she was unable to find an attorney to take her case as Omri Mitchell's brother served as the Sheriff of Lee County and tax assessor. However, Hill did have an attorney when she filed her answer and cross-complaint in 1988. Mantachie, where Hill has lived since 1990, is located in Itawamba, not Lee, County. Regardless of where she lived, Hill could always have obtained counsel from another county.
¶ 40. Hill, quoting precedent, notes that "[o]ur nation's high court stated that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment, and that constitutional due process in such termination proceedings is essential." Natural Father v. United Methodist Children's Home, 418 So.2d 807, 810 (Miss.1982). It would appear that personal choice is one of the underlying problems in this case. Dr. Masur, a psychologist stipulated to be an expert, stated that he believed that Hill "has been, probably, somewhat selfish in *1228 resting on the idea that the child was reasonably well taken care of...." Similarly, Dr. Masur stated that while he had no direct knowledge of Khristal's father, it was Dr. Masur's belief that the grandparents "do all the dirty work, and he seems to come in and [take] the child to the movies and the things that are kind of fun...."
¶ 41. Hill argues that she was effectively deprived of her rights, but it is apparent that she took no affirmative action to use those rights. Hill alleges that she could only spend brief periods of time with Khristal, but she testified at the hearing that she was able to visit whenever she wanted.

3. Actions of Grandparents
¶ 42. Finally, Hill complains that insufficient weight was given to the Mitchells' conduct that damaged her relationship with Khristal. There was some evidence at trial that the Mitchells criticized the girl's mother around Khristal. They told Khristal that her mother had mistreated her when she was just a baby. The chancellor made no finding as to whether the grandparents had done this, and if so, whether what they said was truthful or not.
¶ 43. The chancellor specifically stated in his judgment that Dr. Masur's testimony "suggests that the Mitchells have not made any efforts to conceal their disappointment in Hill and that attitude has spilled over to the minor child." Dr. Masur described the grandparents as being "vindictive" towards Hill and as having done "everything they can to sabotage that relationship" between Khristal and her mother. As Dr. Masur noted, the grandparents and the mother have fought with one another "through the child, and the child is completely aware" of it. Dr. Masur stated that he did not know how Khristal could feel but somewhat uncomfortable about her mother "given the way the grandparents have schooled her and colored her opinions about her mother." The chancellor stated that this behavior was of a type that could not be condoned by the court. Still, it had to be shown that it would be in the best interest of Khristal to transfer custody to her mother.

Conclusion
¶ 44. For whatever reason, Hill allowed Khristal, beginning as an infant, to remain with her ex-husband's parents for an extended period of time before complaining. After a brief and early effort to obtain custody herself, Hill allowed the grandparents' custody to remain unchallenged for eleven years. It is only natural that during that time, Khristal and her grandparents would become emotionally attached and that Khristal might, as many children do, come to share the viewpoints and opinions, whether right or wrong, of those raising her.
¶ 45. We find the chancellor ably resolved a most difficult custody matter. We affirm.
¶ 46. THE JUDGMENT OF THE CHANCERY COURT OF LEE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. KING, P.J., CONCURS IN RESULT ONLY.