# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CT-02065-SCT

*WILLIAM DANIEL VAUGHN*

*v.*

*CONNIE LYNN DAVIS, INDIVIDUALLY, AND AS MATERNAL GRANDMOTHER AND NEXT FRIEND OF DANIELLE LYNN VAUGHN*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:              08/01/2007
TRIAL JUDGE:                   HON. DAN H. FAIRLY
COURT FROM WHICH APPEALED:     RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        WILLIAM P. FEATHERSTON, JR.
ATTORNEY FOR APPELLEE:         SHARON PATTERSON THIBODEAUX
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   REVERSED AND REMANDED - 06/17/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.    William Daniel Vaughn ("Vaughn") appealed from the judgment of the Rankin County Chancery Court awarding physical custody of his daughter, Danielle Lynn Vaughn ("Danielle"), to the child's maternal grandmother, Connie Lynn Davis ("Connie"). The Court of Appeals affirmed. *Vaughn v. Davis*, 2009 WL 1664622 (Miss. Ct. App. June 16, 2009). This Court granted certiorari. *Vaughn v. Davis*, 27 So. 3d 404 (Miss. 2010).

## FACTS AND PROCEDURAL HISTORY

¶2.    Except as otherwise noted, the Court of Appeals correctly and fully laid out the factual

and procedural background as follows:

> Danielle was born in October 2000 out of wedlock. Danielle and her mother,
> Theresa Davis (Theresa) lived with Connie, the maternal grandmother, since
> Danielle's birth. Theresa died as the result of a car accident in March 2002,
> when Danielle was approximately seventeen months old. Danielle's birth
> certificate lists Vaughn as her father. Vaughn's paternity was further
> established through a DNA test. Vaughn and Theresa never married. At the
> time of Theresa's death, Theresa and Danielle lived with the grandmother,
> Connie. Vaughn lived with two roommates in an apartment. He attended
> school and worked full time. After Theresa's death, Vaughn and Connie
> discussed the physical custody arrangements for Danielle. Vaughn and Connie
> mutually agreed that Connie would keep Danielle until Vaughn had finished
> school and gotten back on his feet. After their agreement, Vaughn failed to
> visit Danielle regularly and paid only $100 of support for Danielle prior to
> Connie's filing her petition for custody. He also failed to voluntarily seek
> custody of his daughter when he got back on his feet.

*Vaughn v. Davis*, 2009 WL 1664622, at *1. The amount of Vaughn's monetary support was

disputed.[1] Although Vaughn was in school and living with roommates at one time, that

situation did not continue. He testified that in the years following Theresa's death, he had

(1) attended school only one semester; (2) never received a degree; (3) lived by himself in

an apartment and then with a girlfriend; (4) worked full-time, earning $300-400 per week,

with the exception of three months of unemployment.

¶3.    The Court of Appeals continued as follows:

> At some point after Theresa's death, Connie tried to obtain medical insurance
> for Danielle. The insurance company denied coverage because Connie was
> not Danielle's legal guardian. On August 18, 2004, when Danielle was nearly

---

[1]Connie testified that he made a one-time contribution of $100 at the time of
Theresa's funeral. Connie and her mother, who lived next door, kept a contemporaneous log
of Vaughn's contribution and contacts. Vaughn testified that he gave cash and in-kind
contributions, such as clothes, food, and diapers, but could provide no proof.

four years old, Connie filed a petition for custody and emergency temporary relief. Vaughn and Connie signed an agreed temporary order dated August 20, 2004, granting Connie temporary custody of Danielle.

*Id.*

¶4. In her petition for custody, Connie listed several reasons why she should be granted custody, including that Vaughn had "gone as long as four months without any contact whatsoever with his minor child, either in person or via any other method of communication." Connie also asked that Vaughn be required to pay child support and to maintain a life-insurance policy, with Danielle as the beneficiary. Connie did not request termination of Vaughn's parental rights. The "Agreed Order for Emergency Temporary Custody and Other Relief" granted Connie the "temporary care, custody and control" of Danielle, subject to Vaughn's "temporary visitation rights" pending a final hearing, which was set for February 16, 2005. Vaughn acknowledged paternity at that time. The order did not address child support. Vaughn signed the agreed order on the advice of his then-attorney. He testified that his understanding of the order was that "the judge has to hear the whole case and then he'll decide who Danielle lives with. So it was never my understanding or never my intentions to give up my daughter." However, he did understand he was "temporarily giving [Connie] custody." At the time the agreed order was signed, Vaughn was unemployed and living with his girlfriend.

¶5. The custody hearing was continued several times, as a psychologist was appointed to evaluate Danielle, and a guardian ad litem ("GAL") was appointed for her. *See id.* While awaiting the hearing, Vaughn was granted visitation, which he exercised inconsistently. The court-appointed psychiatrist reported in 2006 that Vaughn was "inconsistent in his interaction

3

with the child. This is evidenced by long periods in which he would not contact her and periods in which she is not with him in which he does not call or write her. In addition, he leaves her with others when he does have her." In a later report, the psychiatrist reported that Vaughn was "well intentioned," but his lack of "follow through . . . has been evident." Vaughn first began to pay child support a few months after the agreed order. Several months after testifying that he had already done so, he obtained health insurance for Danielle through his policy at work.[2] Vaughn obtained a life insurance policy, but named his new wife as the sole beneficiary.

¶6.     Regarding the three-year wait before the hearing, the Court of Appeals stated the following:

> Vaughn [regained] full-time employment, married Melissa Vaughn, bought a home, and had a son with Melissa. The chancery court finally heard Connie's petition for custody on August 1, 2007, and entered a final order granting [physical] custody of Danielle to Connie. Danielle was nearly seven years old at the time of the hearing.

*Id.* The chancellor granted Connie and Vaughn joint legal custody. Vaughn was allowed liberal visitation and was required to pay child support and to maintain health insurance for Danielle.

¶7.     The Court of Appeals continued as follows:

> On appeal, Vaughn argues that the chancellor erred in not giving him the benefit of the natural-parent presumption, which arises in custody disputes between natural parents and third parties. *Grant v. Martin,* 757 So. 2d 264, 265 (¶ 5) (Miss. 2000). Utilizing the standard adopted . . . in *Grant,* however,

---

[2]Vaughn testified that this was a misunderstanding that was worked out with the help of the GAL. Prior to being covered by Vaughn's insurance, Danielle was on Medicaid.

4

the chancellor reasoned that Vaughn relinquished the natural-parent presumption . . . .

*Id.* The Court of Appeals affirmed the chancellor's order granting physical custody of Danielle to Connie, finding that (1) Vaughn had "relinquished the natural-parent presumption when he agreed to allow Danielle to remain in Connie's custody pending a hearing . . . ."; and (2) the decision below was "further buttressed by Vaughn's voluntary and extended failure to seek custody . . . ." *Id.*

¶8.     Allowing *Grant* to control on the facts as presented in the case *sub judice* would create a disincentive for parents to allow children to remain temporarily in a safe and stable environment while custody issues are decided. Pairing the *Grant* analysis with a finding that Vaughn had relinquished custody through his inaction is likewise unavailing. The chancellor made no such finding, but based his analysis solely on the application of *Grant*. The chancellor found that Vaughn was neither mentally nor morally unfit to have custody of the child, nor had he abandoned the child through his inaction. However, because Vaughn had agreed to the temporary custody order, he had given up the natural presumption, thus allowing the chancellor to complete an *Albright* analysis, which favored Connie. *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). After finding that Connie stood "*in loco parentis* . . . to the child," the chancellor stated that "the affections of this child have become so engaged to [Connie] that a severance of that relationship would result in destroying the best interest of the child."

## ANALYSIS

5

¶9. "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. . . . A chancellor's conclusions of law are reviewed de novo." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (Miss. 2009) (citations omitted). We analyze a single issue: Whether the chancellor erred in denying Vaughn the benefit of a natural-parent presumption based on his agreeing to the order for temporary custody.

¶10. "At the outset of this discussion, we reaffirm that the paramount and ultimate goal in every child custody case must be the best interests of the child." *In re Dissolution of Marriage of Leverock and Hamby*, 23 So. 3d 424, 429 (Miss. 2009). The *Leverock* Court stated further:

> In Mississippi, it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party. *K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (Miss. 2006). This presumption is echoed in Mississippi Code Section 93-13-1: "The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education. . . . If either father or mother die or be incapable of acting, the guardianship devolves upon the surviving parent." Miss. Code Ann. § 93-13-1 (Rev. 2004). However, we also recognize that this presumption or preference for a natural parent may be rebutted.

*Id.* at 429-30.

¶11. The chancellor believed he had only two options. He would have to find Vaughn immoral or unfit as a parent, or that he had abandoned the child, and then do an *Albright* analysis to determine Danielle's best interests. Or, if he failed to find immorality, unfitness, or abandonment, he would have to grant custody to Vaughn without regard to Danielle's best interests. The chancellor found abandonment through Vaughn's agreement to temporary custody. Following this finding, the chancellor determined that Danielle's best interests were served by continuing to live in Connie's home, the only home Danielle had ever known.

6

¶12. We find that the chancellor was not required to make such a stark choice under these facts. Our custody statute, as cited in *Leverock*, offers another option, a finding of desertion, as follows:

> Upon a finding by the court that both of the parents of the child have abandoned *or deserted* such child or that both such parents are mentally, morally or otherwise unfit to rear and train the child the court may award physical and legal custody to . . . [t]he person in whose home the child has been living in a wholesome and stable environment. . . .

Miss. Code Ann. § 93-5-24(1)(e)(i) (Rev. 2004) (emphasis added); *see Leverock*, 23 So. 3d at 430. Thus, the chancellor could have treated Vaughn's inaction prior to the agreed order as desertion of Danielle. If so, Vaughn would have forfeited the presumption he had as her natural father, even though his actions/inactions do not compare to the behavior our courts have found to constitute abandonment or constructive abandonment. *Governale v. Haley*, 228 Miss. 271, 275-78, 87 So. 2d 686, 687-89 (Miss. 1956) (abandonment, leaving child with a relative for ten years); *Loomis v. Bugg*, 872 So. 2d 694, 695-96 (Miss. Ct. App. 2004) (unfitness); *Hill v. Mitchell*, 818 So. 2d 1221, 1222-23 (Miss. Ct. App. 2002) (constructive abandonment, child allowed to stay in court-ordered temporary physical custody of grandparents for eleven years). However, desertion, if found, would apply.

¶13. This Court in *Leverock* distinguished abandonment and desertion as follows:

> Abandonment is "any conduct on the part of the parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child." [*Ainsworth v. Natural Father,* 414 So. 2d 417, 419 (Miss.1982).] In defining the term "desert," this Court in *Ainsworth* noted the following definitions: "2. To forsake (a person, institution, cause, etc., having moral or legal claims upon one). 3. To forsake one's duty, one's post or one's party." *Id.* at 420. This Court explained that "abandonment has to do with the relinquishment of a right or claim, whereas desertion involves an avoidance of a duty or obligation."

7

*Leverock*, 23 So. 3d at 430 n.2. The ***Ainsworth*** Court cited Webster's and the Oxford English Dictionary for the definitions of both words, finding that the "definition of abandonment in ***Wright v. Fitzgibbons***, [198 Miss. 471, 477-78, 21 So. 2d 709, 710-11 (1945)], seems to include both avoidance of duty and relinquishment of right." ***Ainsworth v. Natural Father***, 414 So. 2d 417, 419-20 (Miss. 1982).

¶14.    In ***Leverock***, this Court found[3] that a father had deserted his son by "completely avoid[ing] both his moral and legal duties and obligations as a father for more than two years. During this period of time, he showed a complete disregard for the welfare of his young son." *Leverock*, 23 So. 3d at 431. The ***Leverock*** Court continued that the father had chosen "'to take an extended holiday from the responsibilities of parenthood' and we find that he should not now be able to claim the benefit of his status as a natural parent . . . ." ***Id.*** at 431-32 (citation omitted). The Court stated that, once "abandonment, desertion, or other acts demonstrating unfitness to raise a child" are found "by clear and convincing evidence," the natural-parent "presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the ***Albright*** factors." ***Id.*** at 431. In this ***Albright*** analysis, even though the natural parent has lost the presumption, a court may still consider "society's interest in preserving the natural parent and child relationship whenever possible," but a chancellor should consider it as "only one factor,

---

[3]Six justices were in the majority, which reversed and rendered the desertion issue. ***Leverock***, 23 So. 3d at 434. Two justices would have reversed and remanded. *See id.* at 435-38 (Pierce, J., concurring in part and dissenting in part, joined by Carlson, P.J., joined in part by Waller, C.J.). Thus, the Court was eight-to-one on the question of reversing the chancellor's grant of custody to the father.

8

among many, to be considered. " *Id.* The Court instructed the chancellor to consider "the present circumstances of the parties" in the custody determination, as two years had passed since the hearing. *Id.* at 432.

¶15.    It was error here to find that *Grant* controls. In *Grant*, a mother relinquished custody of her three children to their paternal grandparents. *See Grant*, 757 So. 2d at 264. The grandparents were appointed as guardians via a chancellor's order. Two years later, when the parents divorced, a settlement agreement granting custody of the children to the grandparents was incorporated into the final judgment of divorce. *See id.* at 265. More than two years later, after the mother had remarried, she petitioned for a modification, which was denied. *See id.* The Court of Appeals, finding no unfitness or abandonment, reversed and rendered in the mother's favor. *See id.* at 266. This Court reversed the judgment of the Court of Appeals, setting a new standard "that a natural parent who voluntarily *relinquishes* custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption." *Id.* (emphasis added). The Court stated that, in setting the new standard, it did not "want to encourage an irresponsible parent to relinquish . . . custody to another for convenience sake, and then be able to come back into the child's life years later and simply claim the natural parents' presumption . . . ." *Id.* The *Grant* Court also reaffirmed the principles that (1) "stability in the lives of children is of such great importance," and (2) "the polestar consideration in all child custody cases is the best interest of the child . . . ."[4] *Id.*

_____

[4]Webster's defines "polestar"as "1. Polaris, a star that is vertical or nearly so, to the pole of the earth, also called North Star. 2. That which serves as a guide or director."

¶16. The mother in *Grant* gave up custody of her children through a court of competent jurisdiction on two different occasions, i.e., the guardianship and the divorce decree. *Id.* at 264-65. When she gave up custody the first time, she actually was relinquishing physical custody of the children. Unlike in *Grant*, Vaughn never had physical custody of Danielle, thus, he had nothing to relinquish. He merely allowed Connie to *retain* custody, which was a proper temporary arrangement, until a hearing could be held. Vaughn could not have known at that time that three years would elapse before the hearing was held, and that five years (and counting) would go by before a decision would be made on Danielle's long-term custody. Vaughn's signing this agreement does not equate to abandonment. A comparison of the temporary nature of this agreement with the guardianship in *Grant* is flawed. In *Grant*, there was a divorce decree, as well as a guardianship order. *Id.* Here, there was only a temporary agreement awaiting a hearing.

¶17. We affirm the chancellor's finding that Connie stood *in loco parentis* to Danielle. "We have defined a person acting *in loco parentis* as one who has assumed the status and obligations of a parent without a formal adoption." *Leverock*, 23 So. 3d at 430 (quoting *Logan v. Logan,* 730 So. 2d 1124, 1126 (Miss. 1998). The record shows that Connie took Danielle into her home and provided parental supervision and support as though she were her own child. *See Farve v. Medders,* 241 Miss. 75, 81-82, 128 So. 2d 877, 879-80 (1961)."

**CONCLUSION**

---

Webster's New Universal Unabridged Dictionary 1391 (2d ed. 1983).

10

¶18. Thus, we reverse the judgments of the Court of Appeals and the trial court, and we remand the matter to the Chancery Court of Rankin County for proceedings consistent with this opinion. Specifically, the court is to determine if Vaughn relinquished the natural-parent presumption for reasons other than forfeiture by agreeing to a temporary custody order. Three years have elapsed since the last hearing. Thus, the chancellor should consider Danielle's circumstances at the time of the remand hearing, if he determines that desertion has been proven. As always in custody matters, the best interests of the child should guide the analysis as a polestar. As the chancellor's judgments on joint legal custody, visitation, *et cetera*, were not part of this appeal, the chancellor retains his discretion in crafting the best arrangements, considering present circumstances.

¶19. **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, AND CHANDLER, JJ., CONCUR. PIERCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND CARLSON, P.J.**

**PIERCE, JUSTICE, SPECIALLY CONCURRING:**

¶20. While I concur with the majority's holding and analysis, I cannot join the majority opinion where it adopts the analysis found in *In re: Dissolution of Marriage of Leverock and Hamby*, 23 So. 3d 424 (Miss. 2009). Specifically, the majority discusses this Court's finding that the father in *Leverock* "deserted his son by 'completely avoid[ing] both his moral and legal duties and obligations as a father for more than two years.'" (Maj. Op. ¶ 14) (quoting *Leverock*, 23 So. 3d at 431).

11

¶21.    As I stated in *Leverock*, as an appellate court, this Court is responsible "to review the decision of the chancellor, not to make an original determination." *Id.* at 434-435 (Pierce, J., concurring in part and dissenting in part).  The chancellor in *Leverock* did not make adequate findings on the record to support this Court's *sua sponte* determination that the father had deserted his child.  Because I am of the opinion *Leverock* was wrongly decided, I cannot join the majority opinion in which it adopts this Court's analysis in that case. Otherwise, I fully concur.

**WALLER, C.J., AND CARLSON, P.J., JOIN THIS OPINION.**