# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00115-COA

**IN THE MATTER OF THE GUARDIANSHIP OF**
**C.B.F., A MINOR: PAUL FOUNTAIN**                                                    **APPELLANT**

**v.**

**HOLLEE FOUNTAIN REON, CLAYTON**                                                    **APPELLEES**
**KEETON, AND ARMONDA FOUNTAIN**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/05/2017 |
| TRIAL JUDGE: | HON. JERRY G. MASON |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | LESLIE C. GATES |
| ATTORNEY FOR APPELLEES: | GEORGE H. SPINKS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED: 05/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND GREENLEE, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.    Paul Fountain, the maternal grandfather of C.B.F., hereinafter referred to as Carter,[1]

appeals the chancellor's application of the natural-parent presumption and award of custody

to his daughter, Hollee Fountain Reon, Carter's mother.  We find no error and affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.    Hollee, born in 1998, is the daughter of Paul and Armonda Fountain.  Hollee and

---

[1] For privacy purposes, we substitute a fictitious name for the minor child and use the
fictitious name in lieu of initials to facilitate review of the opinion.

Clayton Keeton are the natural parents of Carter, a male child born in 2013.[2]  Shortly after Carter's birth, Hollee was admitted to a mental-health center for approximately two weeks to receive inpatient treatment for post-partum depression.

¶3.    Following the birth of Carter, Hollee and Carter lived with Armonda in Meridian. Hollee's boyfriend, Travis, would occasionally stay with her at Armonda's residence.  Paul would visit with Carter on the weekends.

¶4.    On June 12, 2013, Armonda filed a "petition for appointment of temporary guardians for minors" in the Chancery Court of Lauderdale County.  The petition, which Hollee joined, sought the appointment of Armonda "as temporary guardian of [Carter] until such time as the mother of said minor, [Hollee], c[ould] demonstrate to th[e] [c]ourt that she [wa]s ready and capable of caring for said minor."

¶5.    In September 2013, Hollee, Carter, and Travis left Armonda's residence after an argument over money.  They moved into Paul's residence in Collinsville.  Approximately two weeks later, Hollee, Carter, and Travis went to Paul's mother's house in Picayune, where they stayed for three weeks.  According to Hollee, upon her return to Paul's residence, Paul informed her that she could "take [Carter] and go to Vicksburg or stay [t]here and go to East Mississippi State Hospital."  That night, Paul took Hollee and Travis to Travis's parents' house in Vicksburg.  However, when Paul failed to bring Carter to her, Hollee returned to Meridian.  Upon Hollee's return, Paul informed her that she could not have Carter; that he had custody of him.

---

[2] Hollee and Clayton's relationship ended when Hollee became pregnant with Carter.

¶6.    Unbeknownst to Hollee or Armonda, Paul had initiated custody proceedings in the Lauderdale County Youth Court.  On October 1, 2013, a shelter hearing was held "based upon a[n] affidavit alleging that [Armonda] ha[d] kicked [Hollee] out of her household and [Hollee] has a 6[-]month[-old] infant to care for as well."  Following the shelter hearing, a temporary placement judgment was entered, which awarded temporary physical and legal custody of Hollee to Paul.

¶7.    A second shelter hearing was held on October 22, 2013, wherein Paul claimed that Hollee had run away from his home with her boyfriend, leaving Carter with him.  Following the shelter hearing, the youth court temporarily placed physical and legal custody of Carter with Paul.

¶8.    On October 11, 2013, the chancery court, also unaware of the youth court proceedings, granted Armonda's petition for temporary guardianship and appointed Armonda as temporary guardian of and over Carter.[3]  The chancellor noted that Clayton had been notified of and approved the appointment.  The chancellor further noted that the temporary guardianship covered physical custody only.  The chancellor ordered yearly status reviews of the guardianship.

¶9.    On November 18, 2013, Hollee's attorney wrote a letter to the youth court seeking clarification of the proceedings.  Thereafter, on December 19, 2013, the youth court entered a judgment transferring jurisdiction to the chancery court and acknowledged that it "was not informed of any pending [g]uardianship . . . ."  As a result of the transfer, an adjudication

_____

[3] For unknown reasons, the order entered by the chancellor on October 11 was not filed by the chancery clerk until October 30, 2013.

3

hearing was never heard in the youth court.

¶10. Following the transfer of jurisdiction to chancery court, Carter remained in Paul's custody. Paul filed a complaint for relief from judgment pursuant to Mississippi Rule of Civil Procedure 60(b), as well as a counterclaim for guardianship or, in the alternative, a petition for change of guardian and/or for modification of guardianship.

¶11. Hollee and Armonda filed a motion for visitation with Carter. Following a hearing, the chancellor granted temporary visitation between Hollee and Carter to be supervised by Armonda. Hollee became emancipated on February 14, 2015, at the age of sixteen, when she married Adrien Reon.

¶12. The chancellor appointed a guardian ad litem (GAL). In her initial report, filed May 27, 2015, the GAL opined that Hollee forfeited the natural-parent presumption and voluntarily relinquished custody of Carter to Armonda upon her joinder in the petition for appointment of temporary guardianship. The GAL conducted an *Albright* analysis and found that the factors favored Paul.[4] The GAL concluded that Paul should be granted custody of Carter.

¶13. The GAL filed a first supplemental report on December 1, 2015, and found that Clayton willfully deserted Carter through his inaction and avoidance of duty. Additionally, the GAL noted that she had spoken with Erica Flake, a psychiatric nurse practitioner, who began seeing Hollee in November 2014. According to Ms. Flake, Hollee had been diagnosed with bipolar disorder and attention deficit hyperactivity disorder and was on daily

---

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

medication. She and Hollee would meet at least once a month, but often twice a month. At Ms. Flake's recommendation, Hollee also sought therapy with Beth Wilkerson to further assist her in developing coping skills. Ms. Flake reported that Hollee was "stressed about [Carter] not being in her custody." Ms. Flake advised that she had seen improvements in Hollee's behavior.

¶14. On December 23, 2015, Armonda, Hollee, and Clayton filed their answer to Paul's complaint and counterclaim for guardianship and also filed a counterclaim for custody and guardianship. Specifically, Armonda, Hollee, and Clayton requested that Hollee be awarded custody of Carter or, alternatively, that Armonda be appointed temporary guardianship until such time as Hollee could demonstrate that she was ready and capable of caring for the minor child. Armonda, Hollee, and Clayton also filed an "amended petition for appointment of temporary guardian for minors."

¶15. On April 11, 2016, the GAL filed a second supplemental report and noted that Hollee and Adrien had purchased the house next door to Armonda and moved into the home in late December 2015. The GAL toured the home and found it needed improvements. The GAL further noted Hollee's continued treatment with Ms. Flake and Ms. Wilkerson "on a regular basis." Importantly, the GAL opined that although Hollee "posed a probable serious harm or detriment to [Carter] at the time that this suit was brought by . . . Paul[,] . . . Hollee has matured as a person, thus making her a more suitable caregiver, and she has taken ownership of the management of her mental illness." However, the GAL maintained that Hollee waived the natural-parent presumption by voluntarily relinquishing custody of Carter to Armonda.

¶16. The GAL's third supplemental and final report was filed September 15, 2016. The GAL noted that although some improvements to Hollee and Adrien's residence had been made, additional improvements were still needed.

¶17. This matter went to trial in September 2016. On January 5, 2017, the chancellor entered a memorandum opinion and final judgment and awarded Hollee custody of Carter. The chancellor first determined that Hollee did not voluntarily relinquish custody of Carter and forfeit the natural-parent presumption. The chancellor found that the order granting temporary guardianship was void due to a lack of subject-matter jurisdiction. He noted that the youth court had exclusive jurisdiction from October 2013 through December 19, 2013. Additionally, the chancellor noted that "Hollee did not join in a request for Armonda to be appointed as a permanent guardian for [Carter] and Hollee did not irrevocably surrender her rights, obligations, and privileges as the natural-parent of [Carter]."

¶18. The chancellor further determined that Paul had not shown by clear and convincing evidence that Hollee abandoned or deserted Carter, that Hollee's conduct was so immoral as to be detrimental to the child, or that Hollee was unfit to have custody of Carter. Moreover, the chancellor found "[t]he evidence d[id] not develop that actual or probable, serious physical or psychological harm or detriment w[ould] occur if the custody of [Carter] [wa]s placed with Hollee."

¶19. Paul now appeals and argues the chancellor erroneously found that Hollee did not voluntarily relinquish custody of Carter and forfeit the natural-parent presumption.

STANDARD OF REVIEW

6

¶20.    "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous."  *Vaughn v. Davis*, 36 So. 3d 1261, 1264 (¶9) (Miss. 2010).  "A chancellor's conclusions of law are reviewed de novo."  *Id.*

## ANALYSIS

### I.    *Whether Hollee forfeited the natural-parent presumption.*

¶21.    Paul argues Hollee "forfeited the [natural-]parent presumption by a voluntary relinquishment."  "At the outset of this discussion, we reaffirm that the paramount and ultimate goal in every child custody case must be the best interests of the child."  *Id.* at (¶10).  Under the natural-parent presumption, "it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party."  *Id*.  However, in *Grant v. Martin*, 757 So. 2d 264, 266 (¶9) (Miss. 2000), the Mississippi Supreme Court established an exception or a new standard for such instances where the natural parent consents to and joins in court proceedings granting custody to a third party.

¶22.    In *Grant*, both the mother and father voluntarily relinquished full custody of their three minor children to the paternal grandparents.  *Id*. at 264 (¶1).  The grandparents were appointed as guardians pursuant to a chancellor's order.  *Id*. at 264-65 (¶1).  Two years later, the mother and father divorced and agreed that custody of the children would remain with the paternal grandparents.  *Id*. at 265 (¶2).  Two years after the divorce and four years after she relinquished custody of her children, the mother petitioned for a modification of custody and the return of her children.  *Id*. at (¶3).  The chancellor denied the mother's request and dismissed the case.  *Id.* at (¶4).

7

¶23. On appeal, this Court "found that grandparents have no right to custody of a grandchild as against a natural parent and that a natural parent's bid for custody must prevail absent a showing of abandonment or unfitness, . . . and reversed and rendered in [the mother's] favor . . . ." *Id*. at 266 (¶7). However, the Mississippi Supreme Court granted certiorari and explained:

> While we do not want to discourage the voluntary relinquishment of custody in dire circumstances where a parent, for whatever reason, is truly unable to provide the care and stability a child needs, neither do we want to encourage an irresponsible parent to relinquish their child's custody to another for convenience sake, and then be able to come back into the child's life years later and simply claim the natural parents' presumption as it stands today.

*Id*. at (¶9). As a result, the court adopted a new standard and held "that a natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption." *Id*. at (¶10). The court reversed and remanded for a full hearing on the merits. *Id.* at (¶11).

¶24. Additionally, in *D.M. v. D.R.*, 62 So. 3d 920 (Miss. 2011), the court analyzed the waiver of the natural-parent presumption. There, the paternal grandparents sought custody and guardianship of the minor child after the adoptive parents died. *Id*. at 921 (¶3). The natural mother, who had consented to the adoption, also sought custody and guardianship of the child. *Id*. at (¶¶2-3). The court found that the mother was not entitled to the natural-parent presumption since an adoption "acts as an irrevocable surrender of all rights, obligations and privileges of the natural parent with and to the child." *Id.* at 927 (¶26).

¶25. Here, unlike in *Grant* and *D.M.*, Hollee did not voluntarily relinquish custody of Carter. Although she joined a petition for appointment of temporary guardianship, such

8

petition never requested that custody of Carter be permanently awarded to Armonda, nor did it relinquish Hollee's rights, obligations, and privileges as Carter's natural mother. Moreover, as noted by the chancellor and acknowledged by Paul, the order granting temporary guardianship was ultimately set aside as void. Thus, unlike in *Grant* and *D.M.*, we have no court order of relinquishment, only a petition for temporary relief, that in no way relinquished Hollee's rights as Carter's mother.

¶26. Paul contends that Hollee's "lack of readiness" and "acquiescence for three years in Paul's actual custody of Carter" are sufficient facts to show voluntary relinquishment by Hollee. However, the record shows Hollee continued to exercise her parental rights, obligations, and privileges throughout this matter. The record shows that despite her joinder in Armonda's petition for temporary guardianship, Hollee never relinquished custody of Carter to Armonda. Instead, Hollee continued to live at Armonda's home with Carter. When she left Armonda's residence and moved in with Paul, Hollee did so with Carter. In other words, Hollee assumed custodial and parental responsibility for Carter despite Armonda's request for temporary guardianship and despite no longer living with Armonda.

¶27. Additionally, Hollee maintained custody of Carter while living with Paul. When Hollee went to visit Paul's mother, she took Carter with her. Moreover, when Paul took Hollee to Vicksburg, it was Hollee's understanding that Paul would bring Carter to her. When that did not occur, Hollee returned to Meridian. Upon her return, she was advised of the custody proceedings in youth court. However, as noted by the chancellor, Paul was not straightforward with the youth court regarding the circumstances in September and October

9

2013. Indeed, as the youth court judgment indicates, Paul asserted that Hollee had "run away" from his home and left Carter in his care. Such an assertion was disingenuous since Paul himself took Hollee to Vicksburg, with knowledge of her location.

¶28. It is interesting that Paul cites Hollee's "acquiescence for three years" as support for his voluntary relinquishment argument when it was Paul's disingenuous assertion to the youth court that led to his award of temporary custody. Indeed, Hollee did not *voluntarily* relinquish custody of Carter to Paul. Instead, Paul initiated custody proceedings in youth court unbeknownst to Hollee, Armonda, and the chancery court. It was not until Paul initiated custody proceedings and claimed that Hollee ran away and left Carter, that Hollee "lost custody" of Carter.

¶29. While it is true that Hollee did not move to set aside the youth court orders or immediately move for custody of Carter, she did, through her attorney, write a letter to the youth court on November 18, 2013, disputing the allegations and seeking clarification of the proceedings. Additionally, Hollee moved for visitation, which was granted. While awaiting trial in this matter, Hollee maintained contact and continued visitation with Carter, and worked to improve her mental health as well as her physical surroundings (i.e., her home) in order to provide a more stable environment for Carter.

¶30. In support of his voluntary relinquishment argument, Paul relies on *Hill v. Mitchell*, 818 So. 2d 1221 (Miss. Ct. App. 2002). In *Hill*, the parents of the minor child divorced in December 1987. *Id.* at 1222 (¶2). In August 1988, the father and the paternal grandparents moved for a temporary emergency order and asserted that since the final decree of divorce,

10

the child had resided with the paternal grandparents. *Id.* at (¶3). The grandparents claimed that the mother had taken the child from their home while under the influence of drugs and alcohol. *Id.* The chancellor found the child to be in immediate danger and entered an order granting the grandparents temporary physical custody of the child. *Id.* at (¶4).

¶31. In September 1988, the grandparents moved for permanent legal and physical custody of the child. *Id.* at (¶5). The father joined the complaint. *Id.* The mother subsequently answered and filed a cross-complaint seeking custody. *Id.* However, there were no further proceedings until the child's mother filed a complaint for modification eleven years later in December 1999. *Id.* at (¶6). Following a hearing, the chancellor found the mother had "constructively abandoned" the child and had "delegated parenting to the [grandparents]." *Id.* at (¶7).

¶32. On appeal, this Court noted that the grandparents had had custody of the child since she was eight months old. *Id.* at 1225 (¶23). Moreover, we noted that the mother had not seen the child "from at least the time that she was eight months old until three years of age." *Id.* We found that "[t]he substantial passage of time, both before the entry of the temporary order and certainly between 1988 and 1999, was an acceptance by [the mother] of the present custody arrangement" and affirmed the chancellor's judgment. *Id.* at 1226, 1228 (¶¶26, 45).

¶33. We find *Hill* distinguishable. Unlike in *Hill*, Hollee did not go years without seeing her child. Hollee maintained contact and visitation with Carter while in Paul's temporary custody. Moreover, unlike in *Hill*, Hollee did not allow Paul's temporary custody to remain unchallenged for eleven years. Although Carter remained in Paul's custody for three years

11

pending trial, there was consistent movement by the parties to litigate and resolve this matter.

¶34. Although Hollee is a young, teenage parent, there is no evidence that Hollee is "an irresponsible parent [who] relinquished [her] child's custody to another for convenience sake" and now attempts "to come back into the child's life years later." *Grant*, 757 So. 2d at 266 (¶9). As Hollee's actions did not amount to a voluntary relinquishment of custody, the chancellor did not err in finding that the natural-parent presumption applied.

       II.       *Whether Paul failed to rebut the natural-parent presumption*.

¶35. Although not specifically asserted, it appears Paul claims the chancellor erroneously concluded that he failed to rebut the natural-parent presumption by clear and convincing evidence. We disagree.

¶36. The natural-parent presumption "may be rebutted by clear and convincing evidence that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody." *Wilson v. Davis*, 181 So. 3d 991, 995 (¶7) (Miss. 2016). Additionally, the presumption "may be rebutted by clear and convincing evidence that actual or probable, serious physical or psychological harm or detriment will occur to the child if custody is placed with the natural parent, such that granting custody to the third party is substantially necessary to prevent such probable harm." *Id.* at 995-96 (¶8). "Such a finding must prevent probable *harm* to the child, and not simply find that the third party can provide the child with different or arguably 'better' things." *Id*. at 997 (¶8). "If the natural parent presumption is rebutted, the court may then proceed to determine whether an award

12

of custody to the challenging party will serve the child's best interests." *Id.* at 995 (¶7).

¶37. Paul does not challenge the chancellor's findings regarding each factor. Instead, Paul claims that "[r]igid adherence [to proving one of the four factors] placed [Carter] in a circumstance which is clearly not in his best interests." *See id.* at (¶8) (noting "that the rigid adherence to proving one of the four precise factors to rebut the natural parent presumption may, in very limited and exceptional circumstances, place a child in a circumstance that is clearly not in his or her best interests"). However, as noted by the GAL, simply because Paul may offer a more suitable home for Carter is not enough to rebut the natural-parent presumption. Indeed, the chancellor found there was no evidence that "actual or probable, serious physical or psychological harm or detriment w[ould] occur if the custody of Carter [wa]s placed with Hollee."

CONCLUSION

¶38. We find the facts of this case do not show that Hollee forfeited the natural-parent presumption by voluntary relinquishment. Additionally, Paul failed to provide clear and convincing evidence to rebut the natural-parent presumption. Accordingly, we affirm the judgment of the Lauderdale County Chancery Court.

¶39. **AFFIRMED.**

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**