# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00211-COA

**PRISCILLA RILEY** **APPELLANT**

**v.**

**ADAM HEISINGER** **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/27/2018 |
| TRIAL JUDGE: | HON. JERRY G. MASON |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM STACY KELLUM III |
| ATTORNEY FOR APPELLEE: | J. DOUGLAS FORD |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 08/25/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. This is the second appeal in this dispute between Priscilla Riley and Adam Heisinger regarding the custody of their daughter, B.H.[1]  In the first appeal, we reversed and remanded the case to the chancery court for a new *Albright*[2] analysis.  *Heisinger v. Riley*, 243 So. 3d 248 (Miss. Ct. App. 2018).

¶2. After the first trial in the case and while the first appeal was pending, Adam filed two contempt petitions against Priscilla.  The parties agreed to hold those issues in abeyance until

---

[1] Initials are used to protect the privacy of the minor child.

[2] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

the first appeal was decided. After this Court's decision, Adam filed a third contempt petition. After a new trial on remand, the chancellor found that Priscilla was in contempt for failing to comply with prior court orders and awarded Adam a judgment for attorney's fees. In addition, after a new *Albright* analysis, the chancellor found that it was in B.H.'s best interest for Adam to have custody. Accordingly, the chancellor granted Adam's petition to modify custody and awarded him custody of B.H. with Priscilla to have visitation.

¶3. Priscilla appeals and raises five issues. First, she argues that the chancellor failed to follow the instructions of this Court's prior decision because he did not focus on the circumstances at the time of the hearing on remand. Second, she argues that the chancellor clearly erred by finding that there had been a material change in circumstances warranting a modification of custody. Third, she argues that the chancellor clearly erred by determining that the *Albright* factors favor Adam. Fourth, she argues that the chancellor should have appointed a guardian ad litem. Fifth, she argues that the chancellor erred by finding her in contempt and awarding Adam attorney's fees. For the reasons discussed below, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY[3]

¶4. Adam and Priscilla met while both were in the military and stationed in Virginia. Adam was an Air Force flight surgeon, and Priscilla was in the Navy. In 2011, Priscilla became pregnant and believed that Adam might be the father. Priscilla later moved to Iowa, and B.H. was born in January 2012. Adam was deployed overseas when B.H. was born. He

---

[3] Background facts and procedural history leading up to the first appeal are drawn from this Court's prior opinion. *Heisinger*, 243 So. 3d at 252-56 (¶¶5-28).

returned to the United States in May 2012 and filed a petition in Iowa for DNA testing and to determine paternity and custody. Adam was then deployed again, which delayed the completion of DNA testing. In May 2013, DNA testing confirmed that Adam was B.H.'s father, and he met B.H. for the first time the next month.

¶5.     In a September 2013 order, the Iowa court determined custody and visitation. The court awarded Adam and Priscilla joint legal custody, awarded physical custody to Priscilla, and awarded visitation to Adam. At the time, Adam was in a residency program in Ohio. In January 2014, Priscilla married Shawn Riley, who was also in the Navy.

¶6.     In November 2014, the Iowa court found Priscilla in contempt for denying Adam visitation with B.H. The court sentenced Priscilla to thirty days in jail, which was suspended on the condition that she comply with a new visitation schedule. The court granted Adam additional visitation to make up for time he had lost because of Priscilla's actions and modified his visitation schedule to allow him two weeks of visitation during each eight-week period. Around the same time, Priscilla, Shawn, and B.H. moved to Meridian.

¶7.     In August 2015, B.H., who was then three-and-a-half years old, visited Adam in Ohio. Adam had to work during part of the visit, and he left B.H. in the care of a babysitter, Mandy. During the visit, Adam noticed small burn marks on B.H.'s finger and forearm. He mentioned the marks to Mandy, and she pointed out another mark she had noticed on B.H.'s buttock. When Adam asked B.H. about the marks, she said she had been burned on the stove or oven while Shawn was cooking. Adam decided to take B.H. to the hospital to document the burns, and a doctor concluded that the burns were in the latter stages of healing. Hospital

3

records reflect that B.H. told hospital staff that she had been burned at Priscilla's house.

¶8.    Priscilla and Shawn travelled to Ohio to pick up B.H. at Adam's house. Priscilla alleged that she and Shawn discovered all three burn marks while Shawn was still in the process of putting B.H. in their car outside Adam's house. According to Priscilla, they asked B.H. about the marks, and she told them that she had been burned at their home in Meridian. Priscilla decided to take B.H. to the local police department to file a report about the burns. B.H. also told the police that she had been burned in Meridian. Priscilla also took B.H. to the hospital for treatment, and the records from this visit to the hospital are similar to those from her prior visit with Adam. After she returned home, Priscilla reported to the Mississippi Department of Child Protective Services (MDCPS) that she suspected that B.H. had been abused and neglected while in Adam's care.

¶9.    Priscilla unilaterally denied Adam his next scheduled visitation based on the burn marks. MDCPS, in coordination with Ohio's child protection agency, investigated Priscilla's allegations and found them to be "unsubstantiated." Nonetheless, Priscilla filed a petition in the Lauderdale County Chancery Court to enroll the Iowa judgment and to suspend and/or modify Adam's visitation with B.H. Priscilla also continued to deny Adam his visitation with B.H.

¶10.    Adam filed an answer and a counterclaim to enforce the Iowa judgment, to modify custody, and to find Priscilla in contempt. Due to Priscilla's allegation of abuse and neglect, the chancellor appointed attorney Frances Stephenson to serve as a guardian ad litem (GAL). Because Adam had been denied visitation and had not seen B.H. for several months, the

4

GAL first met with B.H. and Adam in her office. Because B.H. was uncomfortable around Adam, the GAL recommended that B.H. receive counseling from a child psychologist. The chancellor adopted the GAL's recommendation and ordered B.H. to see Dr. Jennifer Whitcomb. The chancellor also ordered the GAL to continue working with B.H., Priscilla, and Adam to determine if and how Adam's visitation with B.H. should resume.

¶11. Dr. Whitcomb and the GAL determined that Adam should have visitation with B.H. in Meridian first, and, if it went well, B.H. would go to Ohio with Adam for a week-long visit. The Meridian visitation ultimately was a success, and B.H. resumed regular visitation with Adam in Ohio.

¶12. The first trial in this case was held in September 2016. Adam requested visitation with B.H. while he was in Meridian for the trial, but Priscilla refused. Priscilla also refused to allow any post-trial visitation. She told Adam that she would not allow further visitation without a specific court order.

¶13. At trial, Priscilla claimed that she never intended to accuse Adam personally of burning B.H., but she suspected that the burns had occurred while B.H. was in Mandy's care, and she faulted Adam for leaving B.H. with Mandy. Priscilla claimed that she had denied Adam visitation "[t]o protect [B.H.] from being harmed further." Priscilla asked that Adam only be allowed supervised visitation with B.H. in Mississippi.

¶14. Adam denied that B.H. was burned while she was in Ohio. He believed that B.H. was burned at Priscilla's house in Meridian, as B.H. had stated on multiple occasions. Adam also testified about Priscilla's repeated denials of his court-ordered visitation.

¶15. Adam acknowledged that B.H. and Priscilla were close, but he testified that Priscilla was not a good parent because she was trying to exclude him from B.H.'s life. Adam maintained that it would be in B.H.'s best interest for him to have physical custody.

¶16. Dr. Whitcomb testified as an expert in child development. She testified that B.H. denied that Adam had ever hurt her in any way. Dr. Whitcomb concluded that B.H. had a good relationship with Adam, and she had no concerns about B.H.'s safety with Adam in Ohio. Dr. Whitcomb reported that Priscilla cancelled or failed to show up for two of B.H.'s court-ordered counseling sessions, and she opined that Priscilla's continued interference with Adam's relationship with B.H. was tantamount to "emotional abuse." Dr. Whitcomb also suspected that Priscilla had attempted to coach B.H. to accuse Adam of burning her.

¶17. In November 2016, the chancellor entered the first final judgment in this case. The chancellor found that Adam had not abused or neglected B.H. Therefore, he denied Priscilla's petition to suspend visitation or to require supervised visitation. The chancellor also denied Priscilla's request to modify Adam's visitation under the Iowa court order.

¶18. The chancellor next found Priscilla in contempt for willfully violating the Iowa court order by denying multiple visitation requests by Adam. The chancellor found that Priscilla's contempt warranted incarceration, but he suspended her incarceration on several conditions, including her compliance with the court-ordered visitation schedule and continued cooperation in B.H.'s counseling sessions with Dr. Whitcomb.

¶19. The chancellor found that there had been a material change in circumstances related to B.H.'s custody—namely, Priscilla's persistent interference with Adam's visitation and

6

relationship with B.H. The chancellor also found that this change had adversely affected B.H. because Priscilla's misconduct had undermined B.H.'s relationship with Adam. However, after considering the *Albright* factors, the chancellor found that it was in B.H.'s best interest to remain in Priscilla's physical custody. Adam appealed.

¶20. After the first trial, Adam filed a petition for contempt, and subsequently he filed an amended petition for contempt. Adam alleged that Priscilla was in contempt because, among other things, she had continued to deny him visitation, failed to comply with the court's order requiring counseling sessions for B.H. with Dr. Whitcomb, and failed to provide him with a birth certificate. In October 2017, following a hearing, the court entered an agreed order that Adam's contempt petitions would be held "in abeyance indefinitely subject to being later asserted and/or heard." The court also ordered Priscilla to (1) pay Adam $3,000 in attorney's fees, (2) obtain a new birth certificate to "clearly reflect" B.H.'s surname as "Riley-Heisinger," and (3) provide Adam with a certified copy of the new birth certificate. The court further ordered that "[g]iven the break in Adam's visitation" prior to the entry of the order, "the parties shall re-engage the services of [Dr. Whitcomb], should the need arise as Adam exercises his visitation with B.H. hereafter."

¶21. In this Court's subsequent decision in the first appeal, we reversed and remanded the denial of Adam's petition to modify custody. We first held that "[t]he chancellor's finding of a material change in circumstances [was] supported by substantial, credible evidence." *Heisinger*, 243 So. 3d at 257 (¶32). Indeed, we noted that "Priscilla [did] not directly challenge [that] finding on appeal." *Id.* Therefore, "the chancellor was required to conduct

7

an *Albright* analysis" as part of his custody determination, which he did. *Id.* at (¶33).

¶22.  This Court reversed and remanded the case for a new *Albright* analysis because the chancellor had erred by weighing two factors—continuity of care and the emotional ties between the parents and child—in favor of Priscilla. *Id.* at 257-58 (¶¶34-40). Applying prior precedent of this Court, we held that those two factors could not be weighed in Priscilla's favor because her own misconduct had prevented Adam from providing care to B.H. and had undermined his emotional ties to B.H. *Id.* (discussing *Story v. Allen*, 7 So. 3d 295, 298-99 (¶¶21-23) (Miss. Ct. App. 2008)). Therefore, "equity dictate[d]" that those factors should not have favored Priscilla but, at most, should have been "neutral." *Id.* at 258 (¶39) (quoting *Story*, 7 So. 3d at 299 (¶22)). We concluded that a new *Albright* analysis was required because "[t]he error relate[d] to two important *Albright* factors" and "the evidence could have supported a different ruling and a modification of custody." *Id.* at 258 (¶40). We stated that although we were required to reverse and remand for further consideration by the chancellor, "we [would] not substitute our judgment for the chancellor's by rendering a final custody decision." *Id.* at 259 (¶43).

¶23.  On remand, the chancellor set the case for a new trial on Adam's petition to modify custody and pending contempt petitions.[4] The parties stipulated that the chancellor could consider all evidence and testimony from the first trial in his decision on remand. The new trial was held on December 3-4, 2018.

---

[4] Adam had filed a third contempt petition after this Court's decision on appeal.

¶24. Frances Stephenson, who previously served as the GAL,[5] testified that Priscilla continued to interfere with Adam's visitation after the 2016 trial. At the first trial, Stephenson did not recommend a modification of custody. However, on remand, Stephenson testified that she would recommend a change of custody based on Priscilla's continuing misconduct.

¶25. Dr. Whitcomb testified that she continued her counseling sessions with B.H. after the 2016 trial. At that time, Dr. Whitcomb was concerned that Priscilla was coaching B.H. to say that she wanted to visit with Adam "in Mississippi" rather than at Adam's home. Even so, B.H. told Dr. Whitcomb that she was excited to see Adam at Christmas in 2016. In April 2017, Dr. Whitcomb released Priscilla from her obligation to continue B.H.'s counseling sessions, as the court's judgment permitted. She told Priscilla and Adam that she could see B.H. again if either of them had any concerns. Dr. Whitcomb testified that B.H. and Adam had a stable and loving relationship at that time.

¶26. Dr. Whitcomb next saw B.H. in September 2018. At that time, she met with B.H. and Adam, and she testified that B.H. was happy and flourishing and that there was a clear emotional bond between B.H. and Adam. Dr. Whitcomb testified that she still had concerns about Priscilla's parenting. She testified that some of Priscilla's parenting decisions amounted to "emotional abuse," but she did not elaborate.

¶27. Adam testified that since the first trial, he had completed both his residency in Ohio and a one-year orthopaedic surgery fellowship in Virginia. Since 2018, he has practiced in

---

[5] Stephenson was released as the GAL after filing her final report in July 2017.

La Grande, Oregon, in eastern Oregon. At his new practice, he works four days per week from 8:30 a.m. to 4:30 p.m. He is on call at the hospital ten nights per month, but he rarely needs to go to the hospital to see a patient while on call. Adam testified that he has a good life in Oregon. B.H. had enjoyed herself when visiting him in Oregon, and he felt that she would have a good life there too.

¶28. Adam testified that his schedule would allow him to take B.H. to school each morning and pick her up from daycare each afternoon. On days when he did not work, she would not have to attend daycare. He also would be able to take her to her extracurricular activities. B.H.'s school would be only one block from the hospital where he worked, and several of his friends' children attended the school.

¶29. Adam testified that Priscilla repeatedly denied his requests for visitation between September 2016 and October 2017 with only two exceptions: a visit in December 2016 that the chancery court's prior judgment specifically ordered and a visit in February 2017. Adam requested visitation in June 2017 so that B.H. could attend his graduation from his residency program and visit with his mother and sister. However, Priscilla refused his request. Priscilla finally allowed Adam regular visitation beginning in October 2017 after he pursued contempt petitions against her.

¶30. Adam testified that he had been able to communicate with B.H. via Skype more regularly than before the first trial, but there were still problems. He testified that his communications with B.H. were often difficult because of poor internet service or excessive background noise at Priscilla's house, because B.H.'s device would run out of battery, or

10

because Priscilla hovered nearby.

¶31.    Adam also testified that Priscilla had failed to obtain a new birth certificate to show that B.H.'s name was "Riley-Heisinger" and had failed to provide him with a copy of her birth certificate—even though the Iowa court had ordered her to do so in 2015 and the chancery court had ordered her to do so again in the October 2017 agreed order.  Indeed, at the time of trial on remand, Adam still had not received an official copy of B.H.'s birth certificate.  Priscilla also failed to use Adam's last name in Priscilla's school and medical records, which made it difficult or impossible for Adam to communicate with B.H.'s school and doctors.  Priscilla admitted that as recently as July 2018—i.e., even after this Court's decision in the first appeal—she continued to omit "Heisinger" from B.H.'s school forms.  She finally updated B.H.'s school records just a few weeks before the trial on remand.  In medical records, Priscilla continued to identify her husband as B.H.'s father.  In addition, Priscilla told B.H. that her name was "[B.] Riley."[6]

¶32.    Adam testified that Priscilla had refused to re-engage Dr. Whitcomb for additional counseling for B.H.  Specifically, after Adam's visitation resumed in 2017, Priscilla began claiming that B.H. would "freak out" when she was "forced" to visit Adam.  In response, Adam suggested that B.H. see Dr. Whitcomb again—as provided for in the October 2017 agreed order.  *See supra* ¶20.  However, Priscilla refused.

¶33.    At the time of the trial on remand, Priscilla was still living in Lauderdale County, but

_____

[6] Priscilla has regularly identified B.H. by the surname "Riley," which is Priscilla's current (married) surname.  However, as of the time of the trial on remand, B.H.'s birth certificate continued to show her surname as "Strong," which was Priscilla's maiden name and surname when B.H. was born.

11

she had moved two or three times since the first trial. At the time of the first trial, Priscilla was a stay-at-home mother. After the first trial, she returned to work for about ten months, but she quit her most recent job in a dental office about two weeks before the trial on remand, and she testified that she was again a stay-at-home mother. At the time of the first trial, Shawn was in the Navy and stationed at the Naval Air Station in Meridian. At the time of the trial on remand, Shawn had retired from the Navy and was working for a drilling company. Shawn's new job required him to travel frequently, and he was away from home two of every four weeks. Priscilla was caring for four children: her fifteen-year-old stepson, B.H., a four-year-old son, and a two-year-old daughter. Priscilla testified that B.H. and her half-siblings are close.

¶34. Priscilla claimed that she had never denied Adam's visitation requests in bad faith. She claimed that she believed she was following prior court orders. Priscilla testified that she denied Adam's request for visitation to coincide with his graduation and on another occasion because Adam requested beginning and ending dates that were not Saturdays. Priscilla claimed that Saturday-to-Saturday visitation was a requirement of a 2013 Iowa order that had carried forward to the present. Priscilla admitted that she had previously allowed Adam to start visitation in the middle of a week, but she claimed that she had only made an exception to the court order as a "kindness" to Adam.

¶35. Priscilla claimed that she still had not been able to change B.H.'s birth certificate because the 2015 Iowa order included a misspelling of B.H.'s middle name. Priscilla also claimed that she had told B.H.'s doctors and schools that B.H.'s surname was Riley-

12

Heisinger, but she acknowledged that B.H.'s school and medical records continued to identify her surname as "Riley." Priscilla testified that Adam was a good father, although she had numerous complaints about him and his parenting.

¶36. After trial, the chancellor found Priscilla in contempt for violating prior orders by denying Adam visitation and failing to obtain a corrected birth certificate. The chancellor awarded Adam a judgment of $8,000 for Priscilla's contempt. The chancellor also conducted a new *Albright* analysis based on the circumstances at the time of remand and found that it would be in B.H.'s best interest for Adam to have custody. We discuss the chancellor's analysis in more detail below. Based on his determination of B.H.'s best interest, the chancellor granted Adam's petition to modify custody and awarded physical and legal custody to Adam. Priscilla was granted visitation.

¶37. Priscilla filed a motion for a new trial or to amend the judgment and a separate emergency motion to stay the judgment. The chancery court denied Priscilla's emergency motion to stay the judgment. Priscilla then withdrew her motion for a new trial or to amend the judgment and filed a notice of appeal.

**ANALYSIS**

¶38. On appeal, Priscilla argues that the chancellor (1) failed to follow this Court's prior decision because he did not focus on the circumstances at the time of the trial on remand; (2) clearly erred by finding a material change in circumstances warranting a modification of custody; (3) clearly erred by finding that a modification of custody was in B.H.'s best interest; (4) erred by not appointing a guardian ad litem; and (5) erred by finding her in

13

contempt and awarding attorney's fees to Adam. We address these issues in turn below.

## ANALYSIS

### I. The chancellor followed this Court's instructions on remand.

¶39. Priscilla first argues that the chancellor did not follow this Court's instruction to determine custody based "on the best interest of the child and the circumstances as they exist 'at the time of the remand hearing.'" *Heisinger*, 243 So. 3d at 263 (¶59) (quoting *Vaughn v. Davis*, 36 So. 3d 1261, 1267 (¶18) (Miss. 2010)). Priscilla makes this argument even though the chancellor expressly stated in his opinion on remand that his "new *Albright* analysis [was] based upon the circumstances as they exist[ed] 'at the time of the remand hearing.'" Priscilla argues that the chancellor failed to follow this Court's instruction because he considered evidence from the 2016 trial and events that occurred prior to the October 2017 agreed order. Indeed, she seems to argue that the chancellor should have not have considered anything that occurred prior to the October 2017 agreed order.

¶40. We disagree. In our prior opinion, we recognized that more than eighteen months had passed since the prior custody hearing, and we held that the chancellor should determine B.H.'s best interest based on present circumstances. *Id.* We did *not* hold that evidence from the first trial or the events prior to the agreed order were irrelevant to that decision. Indeed, Priscilla's history of denying visitation was clearly relevant to a determination of B.H.'s present best interest. Priscilla repeatedly denied Adam visitation prior to the first trial, and she was held in contempt for it. As soon as she "won" the first trial, she began denying him visitation again. She stopped only after Adam filed yet another contempt petition and

14

pursued it to a hearing. The chancellor was within his discretion to consider that history in determining what custodial arrangement would be in B.H.'s best interest. As the saying goes, "[t]hose who cannot remember the past are condemned to repeat it." George Santayana, *The Life of Reason: The Phases of Human Progress*, *Volume One: Reason in Common Sense* 284 (1905). Priscilla cites no authority that would preclude the chancellor from considering such highly relevant evidence. This issue is without merit.[7]

## II. Based on this Court's prior decision, the chancellor's finding of a material, adverse change in circumstances was the law of the case.

¶41. "To modify child custody, 'the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody.'" *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶20) (Miss. Ct. App. 2015) (quoting *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1013 (¶24) (Miss. 2012)). Thus, the chancellor must first determine whether there has been a material change in circumstances that adversely affects the child. If the chancellor makes such a finding, "the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Id.*

¶42. Much of Priscilla's brief in this appeal is devoted to challenging the chancellor's finding of a material, adverse change in circumstances. However, the chancellor already made such a finding in his 2016 opinion and judgment, and this Court affirmed the

---

[7] We further note that the parties expressly stipulated on remand that "all evidence, including testimony, admitted at the [first] trial" could be "considered by the chancellor for his subsequent opinion and/or judgment."

15

chancellor's finding in our prior decision. *Heisinger*, 243 So. 3d at 256-57 (¶¶27-32). Specifically, "[t]he chancellor found that Priscilla's willful and extensive interference with Adam's visitation and relationship with B.H. was a material change in circumstance because of the harm it had done to Adam's relationship with B.H." *Id.* at 257 (¶32). On appeal, this Court held that the chancellor's finding "was supported by substantial, credible evidence," and we noted that Priscilla did not challenge that finding on appeal. *Id.*

¶43. Given this Court's decision in the first appeal, the chancellor's finding of a material, adverse change in circumstances was the law of the case on remand. *See, e.g.*, *Lewis v. Pagel*, 172 So. 3d 162, 174 (¶23) (Miss. 2015); *Griner v. Griner*, 282 So. 3d 1243, 1250 (¶¶23-25) (Miss. Ct. App. 2019). On remand, the chancellor properly recognized that this Court reversed and remanded the case for a new *Albright* analysis, and he committed no error by proceeding directly to that issue. Accordingly, Priscilla's arguments that there had been no material change in circumstances are without merit.

> **III.   The chancellor did not commit any clear or manifest error in applying the *Albright* factors or by finding that a modification of custody was in B.H.'s best interest.**

¶44. As noted just above, if the chancellor finds that there has been a material, adverse change in circumstances, "the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Strait*, 155 So. 3d at 203 (¶20). "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must

16

defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, the issue on appeal is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).

¶45.    "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. The chancellor's evaluation of the child's best interest must consider the following factors: (1) the age, health, and sex of the child; (2) which parent has had "continuity of care"; (3) the parties' "parenting skills"; (4) the parties' "the willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) the parties' "moral fitness"; (9) "the home, school and community records of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each party; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

¶46.    The chancellor must address each *Albright* factor that is applicable to the case, *Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001), but the chancellor need not decide that each factor favors one parent or the other. *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008). Nor does *Albright* require the chancellor to award custody "to the parent who 'wins' the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "[T]he chancellor has the ultimate discretion to weigh the evidence the way he sees

17

fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). We review the chancellor's application of the factors for manifest error, giving deference to the weight that he assigned each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016).

¶47. On remand, the chancellor found that most of the *Albright* factors were neutral: the age, sex, and health of the child; the parties' physical and mental health and age; continuity of care; emotional ties; the parties' willingness and capacity to provide child care; and the stability of the parties' home environments and employment. The school and community record factor favored Priscilla. Parenting skills and moral fitness favored Adam. After considering all factors, the chancellor found that it would be in B.H.'s best interest for Adam to have custody.

¶48. On appeal, Priscilla argues that the chancellor's finding that the emotional ties and continuity of care factors were neutral "was based on outdated and erroneous information and did not evaluate the current circumstances of the parties." In addition, Priscilla argues that the evidence does not support the chancellor's findings regarding the parties' parenting skills and employment; that the chancellor clearly erred by finding that the moral fitness factor favored Adam; and that the chancellor failed to consider B.H.'s separation from her stepbrother and half-siblings. We address these specific arguments in turn below. We then briefly address the different arguments advanced by the dissent.[8]

¶49. However, we begin with the broader observation that our prior opinion specifically concluded that this was "a case in which the evidence could have supported . . . a

---

[8] The separate opinion concurs on the issues of contempt and attorney's fees but dissents on the issue of custody.

modification of custody." *Heisinger*, 243 So. 3d at 258 (¶40). That is why we remanded the case for *the chancellor* to conduct a new *Albright* analysis and to make a new custody decision—rather than simply affirming the award of custody to Priscilla or rendering an award of custody to Adam. *Id.* at 258-59 (¶¶40, 43). Thus, the chancellor's ultimate finding that it was in B.H.'s best interest for Adam to have custody is entirely consistent with this Court's prior decision.

### A. Emotional Ties and Continuity of Care

¶50. In this Court's prior decision, we specifically held that the emotional ties and continuity of care "factors may not be weighed in favor of Priscilla to any degree because 'equity dictates' that she not benefit from her own misconduct," i.e., her repeated, wrongful denial of Adam's visitation. *Id.* at 258 (¶40) (quoting *Story*, 7 So. 3d at 298-99 (¶¶21-22)). We held that at most, these factors should be "neutral." *Id.* On remand, consistent with this Court's holding, the chancellor held that the factors were "neutral." The chancellor committed no error by following this Court's instructions.

¶51. Priscilla essentially argues that this Court's holding was not binding on remand—and that the chancellor should have weighed these factors in her favor—because she finally began allowing Adam regular visitation while the first appeal in this case was pending (about a year before the trial on remand). We disagree. Priscilla complied with the visitation provisions of the chancery court's judgment only after Adam filed yet another contempt petition while the case was pending on appeal. Her belated compliance does not alter our prior holding that these factors should not be weighed in her favor.

19

## B. Parenting Skills

¶52. Priscilla argues that the chancellor erred by finding that this factor favors Adam because she has had primary responsibility for raising B.H., and there is no dispute that B.H. is a healthy, well-adjusted, and well-behaved child, as well as an honor roll student. In addition, although Priscilla admitted at trial that Adam was a good father, she continues to assert various criticisms of him.

¶53. The chancellor found that this factor favored Adam because Priscilla had repeatedly denied Adam visitation, failed to obtain a new birth certificate with Adam's name, failed to use Adam's name in B.H.'s school records, and failed to utilize Dr. Whitcomb for counseling for stress that (Priscilla claimed) B.H. was experiencing. The chancellor specifically found "that Priscilla has intentionally and irresponsibly attempted to adversely impact the relationship between Adam and B.H." The chancellor's findings are supported by substantial evidence and are not clearly erroneous. While Priscilla appears to be a good and fit parent in her own right, the chancellor did not abuse his discretion by finding that this factor favors Adam based on Priscilla's continued interference in B.H.'s relationship with her father.

## C. Employment and Employment Responsibilities

¶54. The chancellor found that the employment responsibilities factor was neutral. On appeal, Priscilla argues that the factor should favor her because she is a stay-at-home mother, whereas Adam is an orthopaedic surgeon.

¶55. Priscilla was working in a dental office until she voluntarily quit just two weeks prior to the trial on remand. Her husband, Shawn, had started a new job that required him to be

away from home for two out of every four weeks, leaving Priscilla to care for B.H., a teenage stepson, a two-year-old, and a four-year-old.

¶56. Adam works from 8:30 a.m. to 4:30 p.m. four days per week (with Mondays off) and testified that his on-call duty only rarely requires him to leave home. He testified that he could take B.H. to school every morning, that he could pick her up from school on Monday and from daycare the other weekdays, and that he could take her to all of her extracurricular activities and be home with her in the evenings.

¶57. The parties' respective lives and schedules are obviously different, but there is no compelling evidence that either situation would be in B.H.'s best interest. Therefore, the chancellor did not clearly err or abuse his discretion by finding this factor neutral.

### D. Moral Fitness

¶58. The chancellor found that the moral fitness factor favored Adam, citing Priscilla's continued failure to use Adam's surname in B.H.'s school and medical records. Although Priscilla disagrees with the chancellor's finding on this issue, there is substantial evidence to support the chancellor's factual finding, and we find no abuse of discretion by the chancellor as to this factor.

### E. Other Factors

¶59. Priscilla next argues that the chancellor did not give sufficient weight to the fact that Mississippi law favors keeping siblings together. Priscilla testified that her other children and B.H. have a close relationship and that B.H. views them as her full siblings, not step- or half-siblings.

21

¶60. "There is no rule that requires chancellors to keep siblings together. There is a preference for keeping siblings together, but the paramount concern is the best interest of the child." *Kimbrough v. Kimbrough*, 76 So. 3d 715, 726 (¶64) (Miss. Ct. App. 2011). "In essence, the rule from our case law is that the non-separation of a child from his or her siblings is usually in a child's best interest." *Owens v. Owens*, 950 So. 2d 202, 212 (¶35) (Miss. Ct. App. 2006). And "[a]lthough there is a preference for siblings to remain together, this is only one factor" in a chancellor's custody decision. *Wells v. Wells*, 35 So. 3d 1250, 1257 (¶28) (Miss. Ct. App. 2010). A desire to avoid "the separation of siblings should not override a child's best interest in a custody determination[.]" *Owens*, 950 So. 2d at 212 (¶35); *see also Wells*, 35 So. 3d at 1257 (¶27) ("As the chancellor found it would be in the best interests of the children to award custody to [their father], it would be unfair to deny him custody because it would separate [the children] from their half-brother.").

¶61. In the present case, the chancellor did consider Priscilla's testimony that B.H. had a good relationship with her stepbrother and half-siblings. The chancellor also discussed several decisions of this Court and the Supreme Court that have addressed this issue. The chancellor ultimately found that Adam had "clearly shown circumstances contrary to the assumption" that it is in B.H.'s best interests to remain with her step- and half-siblings. In essence, the chancellor found that it was in B.H.'s best interest to be in Adam's custody notwithstanding that it would separate her from her stepbrother and half-siblings. The chancellor's finding on this issue is not clearly erroneous or an abuse of discretion.

¶62. In summary, the chancellor's *Albright* analysis and his determination of B.H.'s best

interest were neither clearly erroneous nor an abuse of discretion. Therefore, we affirm modification of custody to Adam.

### F. The Dissent

¶63. Whereas Priscilla argues that the chancellor erred by not following this Court's instructions on remand (*see supra* Part I), the dissent asserts that we should reverse the chancellor *because* he followed the holding of this Court's prior unanimous opinion. We decline to do so. As we put it in another case,

> The original decision on appeal was [two] years ago. [Priscilla] neither sought rehearing in this court nor certiorari from the supreme court. Since that time further proceedings have been held in the trial court structured around our previous opinion. Based on what she argues should have been our conclusions [two] years ago, [Priscilla] requests that we reverse and remand again—not because the trial court failed to understand or comply with our remand order, but precisely because the court did understand and comply.
>
> The reasons for the law of the case doctrine could not be more clearly presented. We will address what was determined before and how it affects what has returned on this second appeal. Only if an earlier conclusion is found to be manifestly and palpably erroneous will we deviate from it.

*Pearson v. Columbus & Greenville Ry. Co.*, 737 So. 2d 390, 402 (¶¶44-45) (Miss. Ct. App. 1998) (paragraph numbering omitted).

¶64. This Court's unanimous decision in the first appeal was not "manifestly and palpably erroneous." *Id.* To the contrary, it was a straightforward application of our 2008 decision in *Story*, 7 So. 3d 295, 298-99 (¶¶21-22). *Story* squarely held that "equity dictates" that the emotional ties and continuity of care factors should not favor a parent who has repeatedly interfered with the other parent's visitation and relationship with the child. *Id.*[9] In *Story*, this

---

[9] The dissent would also overrule *Story*. *See post* at ¶98.

Court reversed and remanded for a new *Albright* analysis for precisely that reason. *Id.* at 299 (¶23). In our prior opinion in this case, this Court did exactly the same. *Heisinger*, 243 So. 3d at 257-58 (¶¶34-40). Indeed, the relevant part of our opinion quoted *Story* verbatim and then explained why this case was not materially distinguishable. *Id.*[10]

¶65. The dissent's claim that *Story* and our prior opinion somehow tied the chancellor's hands (*post* at ¶97) is also incorrect. The *Albright* factors are not "a mathematical formula," and we have never suggested that a chancellor must award custody "to the parent who 'wins' the most factors." *Blakely*, 88 So. 3d at 803 (¶17). Chancellors are required to consider the *Albright* factors not because the factors dictate a result but rather "to ensure that the chancellor follows a process that leads to consideration of all facts that are relevant to the child's best interest." *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶27) (Miss. Ct. App. 2017). At the end of that process, it remains up to the chancellor to determine what custody arrangement is in the best interest of the minor child involved.

¶66. Moreover, we made it very clear in our prior opinion that the conflicting evidence in this case would support an award of custody to *either* Adam *or* Priscilla. *Heisinger*, 243 So. 3d at 258-59 (¶¶40-43). That is why, as we explained, we would "not substitute our judgment for the chancellor's" but were instead remanding the case for *the chancellor* to

---

[10] The dissent's assertion that the chancellor's initial ruling in this case "complied with *Story*" (*post* at ¶95) is incorrect. We specifically explained in our prior opinion how the chancellor's original ruling in this case tracked the ruling that we reversed in *Story*. *Heisinger*, 243 So. 3d at 258 (¶39). The dissent's assertion that "[i]n *Story*, the chancellor failed to acknowledge or factor in the actions of the wrongdoer" (*post* at ¶93) is equally incorrect. As the *Story* opinion made clear, the chancellor in that case expressly acknowledged and considered the mother's interference in his discussion of these factors. *Story*, 7 So. 3d at 298-99 (¶¶21-22).

determine what custody arrangement would be in B.H.'s best interest. *Id.* at 259 (¶43). The chancellor in this case, who has since retired after thirty-seven years on the bench, entered a detailed opinion on remand. His opinion made clear that he considered all relevant evidence and determined that it was in B.H.'s "best interest" to modify custody and grant custody to Adam. There is nothing to indicate that this experienced chancellor felt like his hands were tied or misunderstood this Court's opinion as dictating a particular result.

¶67. Finally, we address the dissent's assertion that the chancellor did not "properly weigh[]" certain "facts" in his *Albright* analysis. *Post* at ¶91. It is evident that the dissent disagrees with the chancellor's ruling on custody. However, "on appeal in a child custody case, the issue is not whether this Court agrees with the chancellor's ruling, but only whether the chancellor's ruling is supported by credible evidence." *Vassar*, 228 So. 3d at 374 (¶24) (quotation marks omitted). "[T]he chancellor," not this Court, "has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson*, 859 So. 2d at 1013-14 (¶36).

¶68. The chancellor specifically considered all of the various facts the dissent emphasizes and simply weighed them differently than the dissent. In context, the chancellor's ruling is perfectly understandable, not clearly erroneous. For example, the dissent finds it compelling that Priscilla is a "stay-at-home mother" and that B.H. "rode the bus home" and "did not attend daycare" in Mississippi—whereas Adam is "unmarried" and will be B.H.'s "sole care giver" in Oregon. *Post* at ¶¶89-90. However, Priscilla quit her job at a dental office just two weeks before the trial on remand. In addition, Priscilla's husband is away from home two of every four weeks, meaning that half of the time Priscilla was the "sole care giver" for B.H.

and two small children. Adam testified that in Oregon, B.H. would go to daycare Monday through Thursday for two to three hours after school.[11] These facts are all relevant, *and the chancellor's opinion expressly considered all of them*. Obviously, however, a custody arrangement may be in a child's best interest even if it involves time at daycare.

¶69. As another example, the dissent repeatedly refers to the "church [B.H.] regularly attended" in Mississippi. *Post* at ¶92. However, according to Priscilla, B.H. only began attending that church about one month before the trial on remand. Adam testified that he also attends church in Oregon. There is no evidence that B.H.'s spiritual or emotional well-being will be harmed if she attends Adam's church in Oregon rather than the church she attended for one month in Mississippi. The same can be said of the various other activities that the dissent cites, such as horseback riding, cheerleading, and beauty pageants. Adam testified that B.H. had already attended dance classes when she visited him in Oregon, that he had looked into other opportunities for her, and that he could take her to all the extracurricular activities she enjoyed. Again, *the chancellor's opinion expressly considered these facts*, but the chancellor weighed them differently than the dissent. The chancellor did not abuse his discretion or clearly err by doing so.

¶70. In summary, the chancellor (a) followed the prior unanimous decision of this Court, (b) considered all relevant evidence, and (c) found, based on substantial evidence, that it was

---

[11] As discussed above, Adam testified that he works from 8:30 a.m. to 4:30 p.m. four days per week and is only rarely required to go to the hospital when he is "on call." There is nothing in the record to contradict Adam's testimony, and the chancellor appears to have accepted it as fact. The dissent, in contrast, seems suspicious of Adam's testimony (*post* at n.17), but that is not the role of an appellate court. *See, e.g.*, *Irle v. Foster*, 175 So. 3d 1232, 1237 (¶22) (Miss. 2015).

in B.H.'s best interest to modify custody and grand Adam custody. Accordingly, we affirm the chancellor's ruling on custody.

### IV. The chancellor was not required to appoint a new GAL.

¶71. Priscilla argues that the chancellor was required to appoint a new GAL because of Dr. Whitcomb's testimony during the trial on remand that she had "seen evidence of emotional abuse." On cross-examination, Dr. Whitcomb agreed that B.H. was a well-adjusted child. She also agreed that B.H.'s "positive development" was at least partially attributable to Priscilla's parenting, although she also stated that she had "some issues with some of the decisions that [Priscilla had] made" and Priscilla's "extreme behavior." Dr. Whitcomb then testified as follows:

Q:     . . . [B]ut you don't see any evidence of abuse, do you?

A:     I've seen evidence of emotional abuse.

Q:     Okay. Have you seen any evidence of physical abuse?

A:     No, no physical.

Q:     Okay, and you're saying that you've seen evidence of emotional abuse, yet she is well-adjusted and she is developing well?

A:     She is developing well.

Q:     Okay. So does a child who is developing well and is adjusted well, can they be emotionally abused and still have that positive development?

A:     They can still have that hurt inside and . . . there can still be some emptiness there that's disguised. . . . [T]here can still be some unresolved . . . issues going on within the child, but . . . she appears to be highly intelligent. She's friendly; she's kind. . . . [S]he has all those aspects of her personality. . . . I think that can override . . . some of the other issues.

27

This was the extent of Dr. Whitcomb's testimony about "emotional abuse." Dr. Whitcomb did not elaborate as to what conduct by Priscilla concerned her. Nonetheless, Priscilla argues that this testimony required the chancellor to appoint a new GAL sua sponte.[12]

¶72. "In child-custody cases where [allegations of] abuse and/or neglect are raised, the chancellor's decision to appoint a guardian ad litem may be mandatory or discretionary." *Carter v. Carter*, 204 So. 3d 747, 758-59 (¶50) (Miss. 2016). "The appointment is mandatory where the allegations of abuse and/or neglect rise to the level of a 'charge of abuse and/or neglect,' and in those cases 'the court shall appoint a guardian ad litem for the child as provided under [Mississippi Code Annotated section] 43-21-121, who shall be an attorney.'" *Id.* at 759 (¶50) (quoting Miss. Code Ann. § 93-5-23 (Rev. 2013)). "In these situations the chancellor is required to appoint a guardian ad litem, whether the parties requested a guardian ad litem or not." *Id.*

¶73. "However, under Mississippi Code Section 93-5-23, the chancellor is provided discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a guardian ad litem." *Id.* at (¶51). The statute gives "the chancellor some discretion in determining whether there is a legitimate issue of neglect or abuse even in those situations where one party elects to make such an assertion in the pleadings." *Id.* (quoting *Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. Ct. App. 2004)). The chancellor is not

---

[12] As noted above, attorney Frances Stephenson was appointed as the GAL in 2016 based on Priscilla's allegations that Adam abused or neglected B.H. by causing or allowing her to be burned while she was in his care. Stephenson ultimately found that there was no merit to Priscilla's allegations, and she was released from her appointment while the case was on appeal in 2017. Neither party asked the chancellor to appoint a GAL on remand.

required to "appoint[ ] . . . a guardian ad litem based merely on an unsubstantiated assertion found in the pleadings of one of the parties." *Id.* at (¶52) (quoting *Johnson*, 872 So. 2d at 94 (¶8)).

¶74. This Court recently summarized:

> [T]he appointment of a GAL is mandatory only if there is a "sufficient factual basis to support" an allegation of abuse or neglect. The chancery court has "discretion" to determine whether such an allegation is "legitimate." If the court concludes that there is no factual basis for the allegation, then the appointment of a GAL is not mandatory.

*Brown v. Hewlett*, 281 So. 3d 189, 197 (¶30) (Miss. Ct. App. 2019) (citations omitted) (quoting *Carter*, 204 So. 3d at 759 (¶¶51, 53)); *accord Monk v. Fountain*, 296 So. 3d 761, 765 (¶16) (Miss. Ct. App. 2020).

¶75. Applying these precedents, we disagree with Priscilla that the chancellor was required to appoint a GAL sua sponte.[13] Neither party made a formal allegation of abuse. In essence, Dr. Whitcomb expressed a concern that unspecified actions by Priscilla (presumably her interference in B.H.'s relationship with Adam) could emotionally harm B.H. The chancellor was within his discretion not to appoint a GAL based solely on Dr. Whitcomb's concern.

**V.      The chancellor's findings of contempt and award of attorney's fees are supported by substantial evidence.**

¶76. Adam filed three contempt petitions since the end of the first trial: in October 2016, in March 2017, and in August 2018. Each petition alleged that Priscilla was in violation of

---

[13] Although Priscilla did not request a GAL, the issue is not procedurally barred. "The mandatory appointment of a GAL in cases of abuse or neglect is to protect the child, not the parties." *Monk*, 296 So. 3d at 765 (¶17). Therefore, in cases in which a GAL is mandatory, "the chancellor is required to appoint a guardian ad litem, *whether the parties requested a guardian ad litem or not*." *Id.* (quoting *Carter*, 204 So. 3d at 759 (¶50)).

court orders. The first two petitions alleged violations of the 2015 Iowa order. Adam's August 2018 petition alleged violations of the October 2017 agreed order.

¶77. On remand, the chancellor found Priscilla in contempt on each of the three petitions. The chancellor found that Priscilla violated the 2015 Iowa order and the October 2017 agreed order by failing to obtain a new birth certificate showing B.H.'s surname as Riley-Heisinger. The chancellor also found that Priscilla violated the 2015 order by denying Adam visitation (prior to the October 2017 agreed order). The chancellor awarded Adam a judgment for $8,000 in attorney's fees based on Priscilla's contempt.

¶78. On appeal, Priscilla primarily argues that the chancellor erred by considering events that occurred prior to the October 2017 agreed order. In other sections of her brief, she also challenges the chancellor's findings of contempt. We find no error in the chancellor's findings or award of attorney's fees.

¶79. To begin with, we reject Priscilla's argument that the chancellor erred by finding her in contempt and awarding attorney's fees based on misconduct that predated the October 2017 agreed order. In the agreed order, the parties specifically stipulated that Adam's then-pending "claims and allegations of contempt against Priscilla [would be] held in abeyance indefinitely subject to being later asserted and/or heard." In addition, the chancellor's pretrial order on remand specifically set all three of Adam's contempt petitions for trial. Therefore, the chancellor did not err by addressing these issues following the trial on remand.

¶80. With respect to the chancellor's specific findings of contempt, we note that "[w]hether a party is in contempt is a question of fact to be decided on a case-by-case basis. A

30

chancellor has substantial discretion in deciding contempt matters because of the chancellor's temporal and visual proximity to the litigants." *Voss v. Doughty*, 242 So. 3d 952, 958-59 (¶25) (Miss. Ct. App. 2018) (quotation marks omitted) (quoting *Gilliland v. Gilliland*, 984 So. 2d 364, 369-70 (¶19) (Miss. Ct. App. 2008)). "This Court will not reverse a contempt citation where the [chancellor's] findings are supported by substantial credible evidence." *Riley v. Riley*, 196 So. 3d 1159, 1162 (¶9) (Miss. Ct. App. 2016) (quoting *Witters v. Witters*, 864 So. 2d 999, 1004 (¶18) (Miss. Ct. App. 2004)).

¶81. The chancellor's findings that Priscilla was in contempt for failing to change B.H.'s birth certificate and use her correct name are supported by substantial evidence. The chancellor noted that the Iowa court ruled that B.H.'s surname was Riley-Heisinger, and the chancellor found that Priscilla had made no effort to ensure that B.H. went by that name. In addition, the October 2017 agreed order specifically required Priscilla to obtain a new birth certificate that would clearly show B.H.'s surname as "Riley-Heisinger." Yet, the evidence at trial showed that Priscilla made no real effort to comply with this requirement until October 2018, i.e., shortly before the trial on remand. As of the trial on remand, Priscilla still had not obtained a new birth certificate or provided Adam with an official copy of any birth certificate. Thus, there is substantial evidence to support the chancellor's finding of contempt on this issue.

¶82. In addition, the chancellor found that Priscilla failed to comply with the 2015 Iowa order's visitation requirements and wrongfully denied Adam visitation in the aftermath of the September 2016 trial. Specifically, the chancellor held that the 2015 order's visitation

31

provisions remained in effect (until modified by the October 2017 agreed order), and the chancellor found Priscilla in contempt for denying Adam visitation from March 2017 until October 2017. Priscilla argues that she was entitled to deny Adam visitation because he requested visits to begin and end on days other than Saturday. She contends that such requests violated a 2013 Iowa order providing for one-week, Saturday-to-Saturday, visits.[14] The chancellor rejected Priscilla's argument, holding that the 2013 order was superseded by the 2015 order's visitation provisions, which permitted Adam to request two-week periods of his "choosing." We agree with the chancellor's interpretation of the orders, and the chancellor's finding of contempt is again supported by substantial evidence.[15]

¶83.    Because Priscilla was in contempt, Adam was entitled to an award of attorney's fees. In our prior decision in this case, we summarized the law governing such an award:

> The matter of awarding attorney's fees is largely entrusted to the sound discretion of the chancellor. When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment. Fees awarded on this basis, though, should not exceed the expense incurred as a result of the contemptuous conduct. That is, fees incurred litigating other matters—such as custody modification or child support—are not recoverable based on the contempt.

*Heisinger*, 243 So. 3d at 259 (¶45) (citations and quotation marks omitted).

---

[14] On another occasion, in response to Priscilla's repeated denials of his requests for visitation, Adam asked Priscilla to pick a two-week period that would be acceptable to her. Priscilla refused this offer as well. She testified that she refused because the 2015 order required Adam, not her, to select the dates of his visitation.

[15] This issue is unfortunately similar to one that we addressed in the first appeal. *See Heisinger*, 243 So. 3d at 260-61 (¶49) (affirming the chancellor's finding that Priscilla was in contempt for denying Adam visitation and rejecting Priscilla's argument to the contrary because it was "based on frivolous interpretations of the [2015] Iowa order").

32

¶84. Adam's attorney testified and presented a summary of his billing statements for fees actually incurred by Adam related to the contempt petitions. Adam requested fees incurred from October 2016 (when Priscilla again denied him visitation) through August 2018. He excluded any charges related to the first appeal. He also did not request any fees for time related to the actual trial on remand. He requested a total of $23,925 based on 105.1 hours of attorney time at $225 per hour plus 3.75 hours of paralegal time at $75 per hour. The chancellor found that Priscilla should not have to pay all of the fees paid by Adam but awarded $8,000 in attorney's fees for Priscilla's contempt. There is substantial evidence to support the chancellor's award and finding that $8,000 was a reasonable amount for the contempt petitions. *See* Miss. Code Ann. § 9-1-41 (Rev. 2014). Therefore, we also affirm the award of attorney's fees.

## CONCLUSION

¶85. We affirm the chancellor's modification of B.H.'s custody. The chancellor followed our instructions on remand, and his *Albright* analysis and best-interest determination are supported by substantial evidence and are not clearly erroneous. We also affirm the chancellor's finding of contempt and award of attorney's fees to Adam. Priscilla's various arguments on appeal are without merit.

¶86. **AFFIRMED.**

**CARLTON, P.J., GREENLEE AND WESTBROOKS, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD AND McCARTY, JJ. BARNES, C.J., NOT**

33

**PARTICIPATING.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶87.    I agree with the majority that there was sufficient evidence to justify the chancery court's order of contempt against Priscilla and the payment of attorney's fees. I disagree with the majority in affirming the chancellor's *Albright*[16] analysis because I am concerned that it was inadvertently constrained by this Court's remand language in *Heisinger v. Riley* (*Riley I*), 243 So. 3d 248 (Miss. Ct. App. 2018).   I also disagree with the majority's reliance on *Story*, specifically where this Court ordered neutrality determinations on some of the *Albright* factors on remand.  In my opinion, that part of the *Story* holding impermissibly intrudes on fact-finding decisions better left for chancellors.

¶88.    The law concerning custody issues is well settled in Mississippi: "the polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005.  In aiding chancery courts to achieve that laudable goal, the supreme court developed the *Albright* factors for courts to consider.  *Id*.  But those factors are **not** exhaustive and are **not** completely outcome determinative.  *Id*.

¶89.    In the present case, the chancellor found the following facts were proven at trial and recited them in his judgment.  Priscilla and Adam were never married.  B.H. was conceived as a result of their relationship, which occurred while both were in the military and stationed in Virginia.  B.H. was a female child born in January 2012.  On October 28, 2014, Priscilla moved to Meridian, Mississippi.  She lived in Meridian with her new husband, B.H., and

---

[16] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

B.H.'s step-siblings, J.R. and T.R. Priscilla and B.H. initially attended Arkadelphia Church in Bailey, Mississippi, but changed to Antioch Southern Methodist Church because B.H. liked the children's program and several of her friends attended church there. B.H. attended school and was an honor-roll student. Priscilla, a stay-at-home mother, took care of B.H. during the day. B.H. did not attend daycare. Rather, B.H. rode the bus home each day, had a snack, did homework, and then had playtime. She participated with friends in activities such as horseback riding and cheerleading. She also participated in beauty pageants and won several trophies. She was in good health. In addition, B.H. had a strong relationship with her step-siblings and mother and had never been away from her mother more than three weeks at a time. Overall, B.H. had a good life in Mississippi, where she excelled in school and extracurricular activities. Most importantly, she was surrounded by friends and family—the only family she had known since memory came to her.

¶90. Adam testified that he was an orthopedic surgeon living and working in La Grande, Oregon. Adam explained that La Grande is a small rural type town which has one hospital and approximately 15,000 people. Adam testified he worked from 8 to 4:30 four days a week, Tuesday through Friday. Adam was unmarried and would be the sole care giver for B.H. if she moved to Oregon. Instead of going home every day to her mother and step-siblings after school, in Oregon, B.H. would go to daycare. Adam testified that on some days when his work hours were long, his friends could assist him and pick up B.H. from daycare. Adam testified he would split emergency calls with his other partners and explained that he

35

would be responsible for every third day or approximate ten days a month.[17] In Oregon, B.H. would have to essentially start anew with friends, schools, church, and activities without the step-siblings and family with which she had lived the last four years of her eight years of life.

¶91.    I dissent because I do not believe those facts were properly weighed in the chancellor's *Albright* analysis.  Instead, I fear the weight was given to Priscilla's contempt for interfering with Adam's visitation and not having B.H.'s birth certificate changed.  To be clear, I do not pardon or condone Priscilla's actions.  But in giving so much weight to Priscilla's actions, the chancellor, albeit unintentionally, punished the child for her mother's actions.

¶92.    The supreme court has opined that "a change in custody will not be made for the purpose of rewarding one parent or **punishing the other**."  *Ash v. Ash*, 622 So. 2d 1264, 1266 (Miss. 1993) (emphasis added).  B.H. did none of the actions complained of by Adam or found contemptuous by the court.  Yet, she was taken as a young child and moved to Oregon from a home and family she loved, from a school in which she excelled, from a church she regularly attended, and from cheerleading, horseback riding, and beauty pageant activities with friends she cherished.[18]

---

[17] Adam explained that most calls just involved a phone call and would not affect his care and supervision of B.H.  However, he also explained that on those days he was the on-call surgeon and he had B.H., he would simply send "emergent cases" that required immediate surgery to other hospitals.  Whether his partners would acquiesce in such a loss of potential business proposition was not discussed at trial.

[18] The majority's argument about this opinion's recitation of certain facts in the life of this eight-year-old child confuses the point of this opinion.  I certainly not do opine that B.H. will not attend church, school, or have hobbies with new friends in Oregon.  I am sure those things will eventually come to her. The issue is not whether the child will have new

¶93.    I fear the chancellor's *Albright* analysis was irrevocably skewed by this Court's remand order in *Riley I*.  The chancellor relied on this Court's ruling in *Riley I*, which relied on this Court's ruling in *Story v. Allen*, 7 So. 3d 295 (Miss. Ct. App. 2008).  There is no doubt that the first part of the *Story* ruling was well intended.  A wrongdoer should not benefit from that wrong and the chancellor must consider the wrongdoer's conduct in weighing the *Albright* factors.  In *Story*, the chancellor failed to acknowledge or factor in the actions of the wrongdoer.  This Court held the chancellor's findings were "inconsistent" with the factual record.  Then, this Court went to the next step which is the part I fear problematic for an *Albright* analysis.  This Court then instructed the chancellor how to find a certain factor by ordering the chancellor to at the very least find the factor as neutral.

¶94.    *Riley I* relied on *Story* to remand with specific instructions for the chancellor to find certain *Albright* factors neutral when a parent interferes with a court order.  *See Riley I*, 243 So. 3d at 257-58 (¶36).[19]  In doing so, *Riley I* took *Story*'s well-intended pronouncement and inadvertently altered and modified the chancellor's discretion in performing an *Albright* analysis on remand.  *Riley I* ordered the chancellor to apply a neutral weight to two factors because Priscilla was engaged in contemptuous conduct in violation of court orders.

---

friends eventually or a new church eventually—the issue is whether it was in her best interest that she no longer have those places, those friends, her mother, or step-siblings she has known most of her life in Mississippi.  To be clear, this dissent does not presuppose the ultimate custody outcome.  I merely mentioned those pertinent facts to explain the concerns that by ordering certain factors be declared neutral, this Court may have skewed the *Albright* analysis on remand in determining the larger scheme of the child's best interest.

[19] The *Story* opinion was not petitioned for writ of certiorari in the supreme court and, at present, stands as precedent for this Court until overruled.

While that conduct should absolutely be considered by the chancellor, I take issue with this Court **ordering** a neutral application to a particular factor. This Court is not the decision maker in custody matters. That role belongs to the chancellors. Our standard of review in custody matters emphasizes that distinction. "In a custody case, 'the chancellor has the ultimate discretion to weigh the evidence the way he sees fit.'" *Riley I*, 243 So. 3d at 259 (¶43) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)). "We review the chancellor's decision for manifest error, giving deference to the weight that he assigned each factor." *Id*. (citing *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016)). "We do not 'second guess' the chancellor's ultimate decision in the absence of some legal or manifest error." *Id*. (citing *Irle v. Foster*, 176 So. 3d 25, 31 (¶26) (Miss. Ct. App. 2013)).

¶95.    I stand concerned that the precedent set in *Riley I* weakens the oft-quoted standards listed above and places this Court in an inevitable position to second guess chancellors. When a chancellor weighs the *Albright* factors, there are three possible outcomes that can be attributed to each factor—favors father, favors mother, or is neutral. When this Court eliminates any one of those three options or outright orders a certain finding on some of those factors, the fact-finding role of the chancellor is inhibited. For example, in *Riley I*, the chancellor complied with *Story* and obviously considered and factored Priscilla's conduct into his *Albright* analysis; it was clearly written in his opinion and even mentioned in this Court's opinion reversing the chancellor:

> [W]hen the chancellor found that the continuity of care factor favored Priscilla, he reasoned as follows:
>
> Priscilla has had the care of B.H. since the child was born and she has had the

38

primary care of B.H. since September 2013. Of course, she has had more care for B.H. than anticipated [since] September 2013 **because she has denied Adam visitation.** This Court finds that the continuity of care factor favors Priscilla as the custodial parent.

As to the emotional ties factor, the chancellor's reasoning was similar:

Related to the continuity of care factor is the emotional ties of the parent and child factor. B.H. has stronger emotional ties with Priscilla than she has with Adam. However, Priscilla interfered with Adam's development [of] emotional ties with B.H. when she refused and interrupted his visitation with B.H. **This Court finds that the emotional ties of the parent and child factor favor Priscilla as the custodial parent, but Priscilla's refusal and interruption with Adam's visitation diminishes the significance of this factor.**

*Riley I*, 243 So. 3d at 257-58 (¶¶37-38) (emphasis added).  But that was not good enough.

This Court told the chancellor he had to find that factor at least neutral:

In addition, the chancellor did state that Priscilla's misconduct "diminishes the significance" of the emotional ties factor to some unstated extent. **However, in *Story*, this Court held that "equity dictates that the chancellor should have at least found this factor to be neutral."** As to both the continuity of care and emotional ties factors, the chancellor's ruling is inconsistent with this Court's holding in *Story*.  **These factors may not be weighed in favor of Priscilla to any degree because "equity dictates" that she not benefit from her own misconduct.**

*Id*. at (¶39) (emphasis added) (citations omitted).

¶96.   This Court remanded with the instructions for the chancellor to find two factors at issue neutral due to one parent's misconduct despite the fact that the chancellor clearly considered the mother's actions and determined that custody best rested with the mother. *Id*. at (¶¶39-40).  This Court should not "second guess" chancellors when they follow the law and determine the best interest of the child.  Otherwise, this Court puts itself on a slippery slope by telling chancellors how to view certain factors when the chancellor is the one who

listens to the evidence and judges the credibility of the witnesses. That slippery slope could someday justify this Court telling chancellors how to view other factors depending on the facts of the particular case on appeal at that particular time. If that continues, then ultimately, this Court is the one deciding custody cases and not the chancellor. While the first part of the *Story* case was well intended and is good law and good policy, I am concerned that the second part of the *Story* case, the order dictating how a chancellor should weigh certain *Albright* factors on remand, muddies the principle that the best interest of the child should be supreme.

¶97.    I do not believe this Court should be in the business of telling chancellors how to view or how to weigh certain factors. Again, I agree with the first part *Story*'s pronouncement that a parent should not benefit from his or her wrongdoing and that the parent's actions must and should be factored in when considering the *Albright* factors. I disagree with the second part that this Court should tell chancellors what weight to give that evidence or how certain factors must be weighed on remand. There could be additional evidence on remand. There could be credibility issues on remand. There could be other considerations on remand that require a chancellor to weigh a certain factor in favor of the parent who has committed wrongdoing. This Court should not presume to predict the evidence introduced on remand by telling the chancellor he must find certain factors neutral. If the best interest of the child is truly the goal and the "polestar" consideration, then we should not have to direct neutrality as to certain factors when the chancellors, especially after the instruction of the *Story* case, can weigh those factors in light of all of the parents' actions and all of the evidence

40

presented. If a chancellor failed to consider what I call the *Story* corollary to the *Albright* factors, then reversal should be ordered for consideration of the potential effect a parent's wrongdoing could have on the *Albright* factors. But what this Court should not do is send the case back, tying the chancellor's hands on remand by ordering a neutrality of a certain factor when this Court does not know what additional information, if any, may be available to the chancellor.[20]

¶98. Simply put, I think *Riley I* went too far in telling chancellors **how** to rule on certain factors on remand, and this Court should withdraw from the second part of the *Story* pronouncement. I respectfully dissent because I believe the chancellor's decision in this case should be reversed and this case should be remanded for a new *Albright* analysis free from a command from this Court that certain factors be neutral or in Adam's favor. Rather, the chancellor should be allowed to consider all of the evidence in the manner he determines under the *Albright* factors, give each factor what weight the evidence demands, including any misconduct of the parties and thereby determine the best interest of the child.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION IN PART.**

---

[20] The majority opinion and this dissent diverge on one very important issue. This dissent has serious concerns with the second part of *Story*; that the appellate court can order a chancellor to find certain factors neutral in a remand *Albright* analysis. That remand order from this Court could usurp the traditional fact-finding role of chancellors and has the potential to adversely impact the chancellor's *Albright* analysis on remand, especially considering that the appellate court does not know what additional evidence or credibility issues the chancellor may receive on remand. This dissent simply argues that this Court should not compel a finding on any of the *Albright* factors, one way or another. The evidence and the law should guide the chancellor's decision, and then confidence can ensue that the best interest of the child was determined.